UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| GARY EVANGELISTA and KABERIA FUSSELL, | HONORABLE KAREN M. WILLIAMS |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-16824-KMW-EAP |
| HOUSING AUTHORITY OF THE CITY OF CAMDEN, *et al.*, | |
| Defendants. | **OPINION** |

**Matthew Moroney, Esq.**
**Jeffrey Tenthoff, Esq.**
GOLDBERG, MILLER & RUBIN P.C.
121 South Broad St., Suite 1500
Philadelphia, PA 19107

**Joseph P. Guzzardo, Esq.**
GUZZARDO & ASSOCIATES
121 South Broad St., Suite 1600
Philadelphia, PA 19107

*Counsel for Plaintiffs Gary Evangelista and Kaberia Fussell*

**Louis R. Lessig, Esq.**
BROWN AND CONNERY LLP
360 Haddon Avenue
Westmont, NJ 08108

**Andrew S. Brown, Esq.**
FISHER PHILLIPS
430 Mountain Avenue, Suite 303
Murray Hill, NJ 07974

*Counsel for Defendants Housing Authority of the City of Camden, Victor Figueroa, Katherine Blackshear, and Debbie Person-Polk*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

This case concerns the Free Speech rights of government employees. Plaintiffs Gary Evangelista and Kaberia Fussell (together, "Plaintiffs") are both former employees of the Housing

Authority of the City of Camden ("HACC"). Plaintiffs were simultaneously fired on December 19, 2018, after they had repeatedly raised concerns over the misconduct of an upper-level HACC manager. Plaintiffs bring this suit against HACC, as well as three current and former agency officials (together, "Defendants"), in which they allege that they were retaliatorily discharged in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

Presently before the Court is the Motion for Summary Judgment filed by Defendants pursuant to Federal Rule of Civil Procedure 56, which Plaintiffs have opposed. For the reasons set forth below, Defendants' Motion is granted, in part, and denied, in part.

## II.    BACKGROUND[1]

### A.    **The Parties**

HACC is the local agency charged with administering various federal housing programs established under Section 8 of the United States Housing Act of 1937. *See* 42 U.S.C. § 1437f. Those programs are funded by the U.S. Department of Housing and Urban Development ("HUD") and are intended to help eligible, low-income individuals and families afford safe and sanitary housing. (ECF No. 91-2 ¶¶ 15–18.) With this funding, HACC is able to maintain housing units and developments that it owns, which are in turn rented to qualifying households at reduced rates they can afford. (*Id.* ¶¶ 17, 19–20.) Though HACC successfully accommodates many Camden residents, the public demand for HACC's housing is greater than the number of units available, and HACC therefore maintains a waitlist on which qualifying individuals and families wait for housing to become available. (ECF Nos. 91-2 ¶ 19; 96-8 at 239–40.)

---

[1] The foregoing facts are either undisputed or, where disputed, reflect an evidentiary record construed in the light most favorable to Plaintiffs.

Plaintiff Gary Evangelista began working at HACC in 2000 and was, at all relevant times, the Director of Security and Risk Management. (ECF No. 91-2 ¶ 10.) Evangelista's primary job responsibilities were to oversee HACC's on-site security guards and refer any crimes to local law enforcement for further action. (*Id.* ¶¶ 45–46.) Those reports typically involved illicit drug dealing. (ECF Nos. 96-4 at 33; 96-10 at 34.) In his role as the Director of Risk Management, Evangelista managed HACC's insurance policies, ensuring that they were up-to-date and that the premiums were timely paid. (ECF No. 91-2 ¶ 52.) On behalf of HACC, he would also notify the agency's insurance carrier of any claims. (*Id.* ¶ 53; ECF No. 96-4 at 52–53.)

Plaintiff Kaberia Fussell began working at HACC in 2010 and was employed as a Housing Specialist at all relevant times. (ECF Nos. 91-2 ¶ 12; 96-5 at 14–15.) Fussell's primary responsibility was to determine the eligibility of prospective and active residents for public housing. (ECF No. 96-2 ¶ 59.) This typically involved processing housing applications, verifying income and credit history, and running criminal background checks. (*Id.*) Fussell was also a member of the American Federation of State, County and Municipal Employees ("AFSCME"), and served as the shop steward of her local union. (*Id.* ¶ 86.)

The three individual Defendants in this case are all current or former agency officials. They include Vincent Figueroa, the former Executive Director of HAAC; Katheryn Blackshear, the former Deputy Executive Director; and Deborah Person-Polk, the Chairperson of HACC's Board of Commissioners. (ECF No. 91-2 ¶¶ 2–8.)

### B.    Plaintiffs' Speech

In the year leading up to their December 2018 termination, Plaintiffs repeatedly raised concerns over the alleged misconduct of upper-level agency manager and non-party Malcom Isler, HACC's former Director of Asset Management. During this time, Isler was repeatedly alleged to

have engaged in misconduct ranging from fraud to theft. Plaintiffs point out that Isler was never disciplined or seriously investigated for the misconduct they spoke up on, which they attribute to the personal protection offered by defendant Blackshear, an upper-level official with whom Isler shared a self-proclaimed "mother/son relationship." (ECF No. 96-2 ¶ 14.) As Plaintiffs tell it, Blackshear exercised considerable influence over the agency and ultimately, with Polk's backing, pressured Figueroa into firing them in an effort to protect Isler.

Based on the record in this case, it appears that Isler did in fact have a rather controversial and protracted history of misconduct at HACC. Prior to his resignation in February 2019, Isler had been the subject of numerous complaints which were raised, not only by Plaintiffs, but also by other HACC employees and tenants as well. (ECF No. 96-9.) Figueroa later determined that many of these complaints were indeed founded. The scope of Defendants' Motion here centers only on those controversies on which Plaintiffs spoke.

### i. *__Fraud__*

Plaintiffs first reported Isler in the fall of 2017, after Isler arranged for a resident to live in public housing without paying rent. Carol Broomell was simultaneously a HACC employee and a resident at Chelton Terrace, one of the agency's public housing projects. (ECF Nos. 91-2 ¶ 70; 96-2 ¶ 46.) She was also personal friends with both Isler and Blackshear. (ECF No. 91-2 ¶ 70.) At some point, Broomell stopped paying her rent and had by November 2017 accumulated over $10,000 in back-rent. (*Id.*) Eventually, HACC obtained a judgment against Broomell for the unpaid rent and began taking affirmative steps to evict her. (ECF No. 96-5 at 134–35.) However, Isler ultimately intervened, halted her eviction, and instructed Chelton Terrace's property manager to not involve the sheriff. (*Id.*) Isler proceeded to move Broomell to another HACC unit and placed her on a "repayment plan," which Broomell reportedly still has not paid. (*Id.*)

At the time, Fussell worked at Chelton Terrace, with Isler as her direct supervisor. When she first learned of Isler's actions, she concluded that he had not only circumvented HACC's continued occupancy policy, but also violated federal housing law. (*Id.*) Fussell subsequently reported Isler's to Figueroa who, according to Fussell, seemed "paranoid" or "scared":

> [H]e just shook his head like yeah, like I know. [Isler] does things that I'm aware of, and that's all he would say. So at that point, if my executive director doesn't have my back and if he's scared, what's the purpose of reporting anything else?[2]

(*Id.* at 137.)

Evangelista separately learned of Isler's actions and likewise reported him to Figueroa. In Evangelista's view, Isler's actions were not just unlawful, but deeply unfair: "I took it up to Victor to make him aware . . . considering we evict people that owe $400, and here's a person who owed $10,000, but because of her relationships, was allowed to move on." (ECF No. 96-4 at 116.) Evangelista recalls Figueroa responding in a similar manner, namely by saying that there was "little he could do" and that he had "no control over [Isler]" given the protection he had from Blackshear and Polk. (*Id.* at 83.)

By Figueroa's own measure, these allegations were significant and likely violated HUD's rules and regulations:

> [T]his was, you know, possible fraud. I mean, the person is owing $10,000. They were moved out for some reason. I mean, I later found out more detail, but initially it was, you know, she owed us money, it was an exorbitant amount of money, the next thing you know she's in another unit, and that's definitely a big no-no.

(ECF No. 96-8 at 217.) For reasons that are not entirely clear, Figueroa assigned Isler the initial task of "investigating" his own HUD violations. (*Id.* at 226.) It does not appear that Isler was

---

[2] Figueroa has separately testified that the misconduct occurring at HACC was so widespread that he "didn't know who to trust." (ECF No. 96-8 at 236; 236.)

seriously investigated or otherwise disciplined in the wake of these reports. Though, this matter is presently being investigated by HUD's Office of the Inspector General ("HUD-OIG").[3] (*Id.* at 28.)

### ii. *Corruption*

Six months after the Carol Broomell incident, Isler became the subject of another controversy involving similar preferential treatment ostensibly as a political favor to an elected city official. In May 2018, Isler approached Fussell while she was working at Chelton Terrace and informed her that a woman by the name of Angela Coleman would be arriving to be placed in public housing. (ECF No. 96-5 at 140–41.) He further instructed Fussell to process her intake paperwork once she arrived. (*Id.*) Coleman arrived minutes later. (*Id.*)

When processing her paperwork, Fussell discovered that Coleman, in addition to not being on HACC's waitlist, was completely ineligible for public housing. (*Id.*) Evidently, Coleman was a former HACC resident who had been evicted for a drug-related charge following a raid at another housing development—a violation of HACC's "One-Strike Policy" which precluded her re-admission into a federally assisted housing program.[4] (ECF No. 96-4 at 140–41.) However, Coleman also happened to be related to a Camden city councilman, a person whom Blackshear has described as her friend and "political ally." (ECF Nos. 96-5 at 140; 96-10 at 96.)

Fussell proceeded to call Isler to inform him of Coleman's ineligibility, to which Isler reportedly insisted that she approve the paperwork and place her in public housing:

> [H]e said do as you're told. And I said well, Malcom, that's against HUD and I'm not going to jail for anybody. He kept telling me do as you're told. And I said if you feel like I'm being insubordinate or I'm going against you, I encourage you to write

---

[3] Established by the Inspector General Act of 1978, HUD-OIG is tasked with, among other things, preventing, detecting, and investigating fraud and abuse in HUD's programs. *See* 5 U.S.C. §§ 1 *et seq.*

[4] So-called "one-strike" policies permit public housing authorities to prohibit re-admission of any person previously evicted from federally assisted housing for drug-related criminal activity. *See generally* 24 C.F.R. § 960.204.

me up. I encourage you to send me to HR and write me up. He slammed the phone in my ear.

(ECF 96-5 at 141–42) Isler then returned to Fussell's office, took Coleman's paperwork, and left. (*Id.*)

After this incident, Isler permanently removed Fussell from Chelton Terrace and placed her at another HACC housing site. (*Id.* at 141.) After doing so, Isler then went to another HACC employee to process Coleman's paperwork. (*Id.* at 142) When Fussell became aware of this, she called the employee, informed her of Coleman's ineligibility, and cautioned her against following Isler's instructions. (*Id.*) After this employee also refused, Isler reportedly went to at last one other employee, who apparently did comply, which led to Coleman ultimately being placed in Chelton Terrace. (*Id.*)

Evangelista separately learned of the Coleman incident after someone slid information on the matter under his office door. (ECF No. 96-4 at 137–38.) Evangelista has testified that he did not deal with HUD-related matters, but that he nevertheless felt ethically obligated to report Isler to Figueroa, particularly given that such matters technically fell within Isler's purview. (*Id.* at 141–44.)

Figueroa, like Plaintiffs, also suspected that Coleman was receiving preferential treatment as a political favor, and that it was potentially being done at Blackshear's behest. (ECF No. 96-8 at 236–37.) It does not appear that any immediate action was taken. However, around the time Plaintiffs were fired, evidence was uncovered suggesting that Isler had improperly accessed and manipulated HACC's electronic system to place Coleman in public housing. (*Id.* at 227–28.) This matter is also under investigation by HUD-OIG. (*Id.* at 232.)

### iii. *Theft*[5]

In June of 2018, Isler had become involved in another controversy in which he was allegedly utilizing maintenance workers under his direct supervision to steal public assets from HACC's properties, sell them at a local scrap yard, and pocket the proceeds. According to Fussell, a maintenance worker confided in her that over the prior weekend, Isler had instructed him to go to a HACC housing site that was slated for demolition and to take "anything of value that they could scrap" for money (*e.g.*, copper pipes, radiators). (ECF No. 96-5 at 137–38.) He and another worker did as much and ended up making several trips to a scrap yard. (*Id.*) Isler reportedly then took the money, instructed the workers not to report any overtime, paid them out of the scrap proceeds, and pocketed the rest. (*Id.* at 138.) The worker expressed that it "didn't feel right" and further revealed that this was not the first time Isler had instructed them to do this. (*Id.* at 139.)

Fussell subsequently informed Evangelista of the theft. (*Id.*) By this time, Evangelista was already aware of the theft through conversations he had with other HACC employees. (*Id.*) Evangelista maintains that he was not a police officer and that it was never his job to investigate or report on thefts being carried out by any HACC employee, much less a upper-level manager. (ECF No. 96-4 at 127–29, 151–52.) Nevertheless, Evangelista endeavored to prove Isler's theft and ultimately obtained sales receipts and photos of a HACC vehicle at the scrap yard. (*Id.* at 151–52, 156.) During this time, Evangelista had at least three conversations with Figueroa to report the thefts, turn over his proof, and generally to follow up to see if anything was being done. (*Id.* at 129, 132.). According to Evangelista, Figueroa said that he "was waiting for Finance to get back to him." (*Id.* at 128.) However, like the Broomell incident, Figueroa also tasked Isler to investigate

---

[5] The parties refer to this controversy as the "First Cash for Scrap Metal Scheme" and the "Second Cash for Scrap Metal Scheme." However, because both events involve essentially the same allegations and conduct, the Court discusses them together here.

the allegations being made against him and the maintenance workers. (*Id.* at 129.) This matter is also being investigated by HUD-OIG. (ECF No. 96-8 at 246–47.)

### iv. ***Sexual Harassment***

The last controversy involved a maintenance employee by the name of Aaron Yelverton. It is undisputed that Yelverton had been the subject of allegations accusing him of sexually harassing HACC residents. According to Figueroa, Isler was Yelverton's direct supervisor, and he suspected that Isler was actively attempting to protect him from those allegations. (ECF No. 96-8 at 173.)

Yelverton was the maintenance supervisor of Ablett Village, another one of HACC's properties. (ECF Nos. 96-4 at 160; 96-5 at 152.) In the fall of 2018, rumors began circulating among HACC staff that Yelverton was requesting sexual favors from residents in exchange for performing repairs in their units. (*Id.*) Fussell and Evangelista had been in contact regarding those rumors, and Evangelista again conveyed them to Figueroa on at least three occasions. (ECF No. 96-4 at 162.) During one of those conversations, Figueroa reportedly asked Evangelista "to call the Inspector General's Office" because "he could not trust Legal or HR." (ECF No. 96-4 at 162.) However, Evangelista told Figueroa that was a call he would have to make as the Executive Director of HACC. (*Id.* at 162–63.)

Several weeks later, a young female resident visited Fussell's office and told her that Yelverton had previously entered her apartment while she was not dressed, and on another occasion asked her for sex in exchange for unlocking her door (ECF No. 96-5 at 150–51.) Fussell explained that she was not able to help the resident, but chose to refer her to Evangelista because her allegations could conceivably fall within his purview. (*Id.* at 154.) At the very least, Fussell stated that Evangelista was in a better position to help her find the right help. (*Id.* at 154–55.)

However, when speaking with Evangelista, the resident did not reference any sexually inappropriate behavior, but rather complained that maintenance was not fixing things in her apartment despite numerous requests. (ECF No. 96-4 at 163–64.) Given the rumors that were circulating about Yelverton, Evangelista outright asked the resident whether she had experienced any sexually inappropriate behavior; she insisted that she had not. (*Id.* at 164.) The resident reportedly expressed that she did not want to report the issues to Isler "because she had problems with him," to which Evangelista advised that her only other option was to go to Figueroa or, if necessary, to the Board of Commissioners. (*Id.* at 164–65.) Evangelista subsequently advised Figueroa that a resident would be contacting his office about certain maintenance issues. (*Id.* at 166–67.)

### C.    <u>Plaintiffs' Termination</u>

On November 21, 2018, Evangelista overheard Isler having a heated exchange with Figueroa in his office, during which Evangelista could hear them "screaming and yelling [his] name." (*Id.* at 83, 91.) Hours later, both Evangelista and Fussell were informed that they were being suspended. (ECF Nos. 96-4 at 83; 91-18; 91-19.)

In identical letters from Figueroa dated this same day, Plaintiffs were each advised that they were being suspended with pay pending the outcome of an "investigation." (ECF Nos. 91-18, 91-19.) The letters do not disclose what exactly that investigation entailed, but state that Plaintiffs had been "involved in an alleged resident matter" and implied that they had committed "severe violations of [HACC's] Human Resource Policy." (*Id.*) Plaintiffs were further advised that they were "not authorized to communicate with any residents, affiliates and/or employees of the HACC" pending that investigation. (*Id.*)

Plaintiffs were subsequently terminated on December 19, 2018. In separately issued letters dated this same day, Figueroa advised Plaintiffs that were being terminated—not for any misconduct that his prior letters insinuated—but rather for certain infractions they committed while on leave. (ECF Nos. 96-15, 96-16.) Plaintiffs admittedly spoke to each other and other HACC employees while on leave and were thus being fired for having "willingly violated" the prior "written directive" set forth in their suspension letters. (*Id.*) The letters also state that Plaintiffs were found to have withheld certain "information and facts" relevant to the same nondescript "investigation." (*Id.*)

In their Motion, Defendants collectively take the position that HACC's investigation concerned the sexual harassment allegations against Yelverton. (ECF No. 91-1 at 30–31.) They further explain that Plaintiffs were placed on leave "purely for the investigation to occur," while appearing to suggest that they compromised that investigation by speaking to other HACC employees, as well as each other.[6] (*Id.*) Individually, however, Defendants have offered varying and often inconsistent explanations.

For example, Figueroa repeatedly evaded questions during his deposition as to why Plaintiffs were suspended in the first instance and was unable to explain the "severe" policy violations stemming from a resident complaint, as referenced in his letters.[7] (ECF No. 96-8 at 106–16.) Furthermore, he explained the Yelverton incident was just one among many "situations" being investigated. (*Id.* at 116.) When asked to identify those situations with more particularity, he declined, stating that there were "[t]oo many to numerate." (*Id.*) Elsewhere in his deposition, he

---

[6] Defendants' Motion appears to adopt the position taken by HACC's General Counsel which, apart from being inconsistent with the Defendants' individual testimony, has also independently been called into question based on other direct and circumstantial evidence in the record.

[7] For example, Figueroa testified that Evangelista being accused of working a part-time job at a grocery store while on HACC time, but noted that his investigation into the same was "inconclusive" (ECF No. 96-8 at 106, 110.)

stated that he was investigating at least eight other employees for "fraud," including Plaintiffs, but was later unable to confirm whether Plaintiffs had ever been suspected of fraud. (*Id.* at 15–17, 72, 77.) And although Figueroa separately identified Isler as among the individuals being investigated for fraud, he could not "recall the specific details" as to why he was not disciplined or otherwise placed on leave pending the investigation. (*Id.*)

Blackshear, on the other hand, has denied any knowledge or involvement in Plaintiffs' suspension and termination, notwithstanding the fact that she had been copied on all of Figueroa's formal correspondences to Plaintiffs. (ECF Nos. 96-15, 96-16, 91-18, 91-19.) During her deposition, she was incredulous that Figueroa had suspended Plaintiffs at all, much less terminated them. (ECF No. 96-10 at 107–09.) Though, whatever reasons Figueroa might have had for investigating and ultimately disciplining them, Blackshear maintains that they were not "valid reason[s]." (*Id.* at 103–04.) Polk has likewise denied any knowledge or involvement in Plaintiffs' discipline (ECF No. 91-10 at 13–15.)

Plaintiffs have adduced significant direct and circumstantial evidence suggesting that Figueroa, Blackshear, and Polk each played a role in their termination, and that their termination was, as they claim, connected to the allegations they had been making against Isler. In particular, Plaintiffs point to minutes of a meeting held by Figueroa and other HACC employees three weeks after they were terminated. The minutes indicate that the meeting occurred on January 18, 2019, at 1:00 p.m., and record certain statements made by Figueroa concerning Plaintiffs' termination. The minutes are summarized in relevant part as follows:

- Figueroa voiced complaints that Blackshear and Polk were effectively "running the authority" and that they had prohibited any discipline of Isler, who "should have been fired years ago based on his personnel file."

- Figueroa recounted a meeting he had with the mayor concerning Isler's situation and his complaints that Blackshear and Polk were "running the day to day of [HACC]," to which

the mayor reportedly reminded Figueroa that "he was the Executive Director" and instructed him "to do his job."

- Figueroa stated that Plaintiffs "should not have been fired" but explained that he was "being pressured" by Blackshear and Polk over Plaintiffs' complaints, concerning which Figueroa deemed Isler to be "the common thread."

- Figueroa discussed Blackshear's efforts to protect Isler over Plaintiffs' complaints, including a meeting during which Blackshear accused Evangelista of "lying in order to hurt [Isler]" and "demanded" that Plaintiffs be fired.

- Figueroa clarified the reasons behind Plaintiffs' termination, noted that he had previously determined that there were "no grounds for a write up let alone firing," and explained that he had changed his mind because Blackshear and Polk "had him against the wall" and that "there was nothing he could do but to fire" them.

- Figueroa expressed fear about "losing his job" and asked the two employees present to "back him up" with Blackshear and Polk if he would move to terminate Isler, a request to which the employees agreed.[8]

(ECF No. 96-13.) This same day, Figueroa suspended Isler without pay for, among other infractions: "unprofessional conduct, conduct unbecoming of a HACC employee, insubordination, neglect of duty, incompetency, insufficiency, failure to perform duties, poor job performance and other sufficient cause." (ECF No. 99-2 at 34.) In a draft of Isler's suspension notice, Figueroa also cited to "numerous complaints" HACC had received about Isler "from tenants, [Isler's] staff, HUD representatives, outside agencies/partners of the HACC, and other [s]enior staff members." (ECF No. 96-9 at 2.) Figueroa also references "union grievances," "EEOC complaints," as well as other "confidential concerns and complaints" that had been brought to his attention regarding Isler's "behavior, attitude, and actions." (*Id.*)

---

[8] Plaintiffs have also included with their opposition papers an audio recording purportedly between a HACC employee and Blackshear, in which the latter is heard saying that she threatened Figueroa by going to the Board if he pressed the issues surrounding Isler. (ECF No. 96-2. ¶ 22.) Defendants urged the Court to not give this recording any weight because "Plaintiffs did not produce [it] during the course of discovery." (ECF No. 99-1 ¶ 22.) Defendants do not cite to any Federal Rule of Civil Procedure and do not otherwise articulate a specific legal argument for its rejection at this stage of the proceedings. The Court is in receipt of the recording and will hear more complete arguments in advance of trial.

Isler resigned from HACC on February 22, 2019. (ECF No. 99-2 at 31.) Blackshear also retired thereafter on April 1, 2019, which Figueroa attributes to her "feeling the heat" following a conversation in which he insinuated that she might also be implicated in a misconduct investigation. (ECF No. 91-2 at 235–41.) Figueroa has also since retired. (ECF No. 91-2 ¶ 2.)

In September 2019, Isler initiated an action against Figueroa and HACC in New Jersey state court, alleging that he was constructively discharged on the basis of his race, color, and sex. (ECF No. 99-1.) In that case, Blackshear testified that, as Isler's supervisor, she never had "any reason" to discipline him and that he otherwise "performed well." (ECF No. 96-18 at 2.) The trial court subsequently entered summary judgment against Isler, but did not discuss Blackshear's assessment of Isler's performance. (ECF No. 99-2 at 31.) It did, however, reject other portions of her testimony as "not competent," finding it "vague, inconsistent and contradictory."[9] (*Id.* at 38.) In this case, Blackshear similarly maintains that Isler did not neglect his duties, at least with respect to collecting rent, but claims to have "no recollection" of the "other stuff" leading up to his resignation. (ECF No. 96-10 at 68–69.) When asked if she had ever protected Isler from termination, she stated: "I am being honest, I don't know how to answer that." (*Id.* at 42.)

Following her termination, Fussell filed a grievance pursuant to the collective bargaining agreement between her union and HACC, which was subsequently transferred to the New Jersey Public Employment Relations Commission. On March 15, 2020, the arbitrator issued a decision finding that HACC lacked just cause to terminate Fussell, and directed that she be reinstated to her former position with full back pay, benefits, and seniority. (ECF No. 99-2 at 5.) The arbitrator did, however, find that Fussell gave an untruthful answer in response to questioning about her

---

[9] This decision was subsequently affirmed on appeal. *See Isler v. Hous. Auth. of City of Camden*, No. A-2641-21, 2023 WL 7545331 (N.J. Super. Ct. App. Div. Nov. 14, 2023).

conversations while on administrative leave, but concluded that a twenty-day suspension was more appropriate. (*Id.*)

## III.    LEGAL STANDARD

A court may grant summary judgment if the movant shows "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* (internal quotation marks omitted) (emphasis in original). To survive a motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements[.]'" *Trap Rock Indus., Inc. v. local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary

15

judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.    DISCUSSION

Both Plaintiffs assert claims against Defendants for Free Speech retaliation. Fussell, as the only member of a union, has also asserted a First Amendment claim against Defendants for retaliating against her for certain union-related activities. Defendants' Motion seeks the entry of summary judgment with respect to each claim.[10] The Court addresses Plaintiffs' claims in turn.

### A.    First Amendment – Free Speech Retaliation

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend. I. "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). Consistent with this spirit, the Free Speech Clause—which has been incorporated against the States through the Fourteenth Amendment—generally prohibits government interference with "free and unhindered debate on matters of public importance" *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573 (1968). Likewise, it prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citations omitted).

---

[10] Defendants' Motion is generally premised on a defense of qualified immunity. A government official is entitled to qualified immunity where either (1) a constitutional right is not violated; or (2) the constitutional right was not clearly established at the time of the official's actions. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). Defendants Motion here invokes only the first prong.

The Supreme Court has repeatedly stated that a government employee does not surrender these First Amendment protections merely by accepting public employment—"a citizen who works for the government is nonetheless a citizen," and government employers may not "leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). However, not all First Amendment activity is constitutionally protected in the public workplace. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* at 418; *see also Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015) ("It is well established that a government has broader powers to regulate speech when it acts as an employer than when it acts as a sovereign."). Even so, when "employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419 (citations omitted).

To prevail on a First Amendment retaliation claim, "a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)). "If the employee establishes both of those predicates, the burden shifts to the employer to show that it would have taken the same action even if the speech had not occurred." *Id.*

In the instant Motion, Defendants do not challenge the second predicate. Thus, the only question before the Court is whether Plaintiffs can establish that they engaged in speech protected by the First Amendment. A public employee's speech is constitutionally protected when (1) the employee "spoke as a citizen"; (2) the statement involved a "matter of public concern"; and (3)

the government employer lacked "an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019) (quotation marks omitted). Here, Defendants challenge only the first prong.

In *Garcetti v. Ceballos*, the Supreme Court specified that public employees do not speak as citizens for First Amendment purposes when they make statements "pursuant to their official duties." 547 U.S. at 421. "Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014). "Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." *Flora* at 175. In other words, "if there is no genuine dispute of material fact as to the scope of a plaintiff's job duties, a court may determine, as a matter of law, whether the speech at issue fell into the ordinary scope of those duties." *LaTorre v. Downingtown Area Sch. Dist.*, 253 F. Supp. 3d 812, 820 (E.D. Pa. 2017).

While the Supreme Court has not set forth a "comprehensive framework for defining the scope of an employee's duties," it has instructed that the "proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424. "[T]he line between citizen speech and employee speech varies with each case's circumstances," and should generally not be drawn using "simple tests." *Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017). It has, however, "condemn[ed] reliance on 'excessively broad job descriptions' . . . [and] cautioned against a focus on formal job descriptions." *Flora*, 776 F.3d at 177.

Again, Defendants' Motion here is narrow. They do not dispute that Plaintiffs' speech regarding Isler's misconduct was a substantial or motivating factor in their termination. Nor do

they dispute that Plaintiffs' speech pertained to a matter of public concern or that that their termination lacked an adequate justification. Rather, Defendants submit that Plaintiffs' speech concerning each particular controversy was not protected by the First Amendment in the first instance. The Court addresses each of their arguments in turn.

### i. *Fraud*

Concerning the Broomell incident, Defendants argue that Plaintiffs' speech is unprotected because they "spoke to Figueroa, their boss," about a "HACC resident who failed to pay rent to HACC." Defendants further emphasize Plaintiffs' speech took place "during work hours" while on HACC property, and thus conclude that they "were clearly speaking as HACC employees." (ECF No. 91-1 at 16–17.) The Court is unpersuaded.

As an initial matter, Defendants have quite obviously misconstrued Plaintiffs' claims. To chalk up the subject of Plaintiffs' speech to a routine, housing-related matter involving "a tenant who failed to pay rent" requires an exceedingly myopic view of the record. Plaintiffs' speech concerned the corruption and impropriety of an upper-level HACC manager. Figueroa himself has acknowledged the significance of these allegations, stating that they concerned a rather serious form of fraud that not only jeopardized the public's trust in HACC, but also violated HUD's rules and regulations. (ECF No. 96-8 at 227–28, 240.) A constitutional challenge to Plaintiffs' speech is not furthered by reinventing the very "matter of public concern" on which they spoke—a point which Defendants have already conceded for purposes of their Motion.[11] *See Bradley v. W. Chester Univ. of Pennsylvania State Sys. of Higher Educ.*, 880 F.3d 643, 653 (3d Cir. 2018) (stating that

---

[11] "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (internal quotations and citation omitted). Plaintiffs' speech here undoubtedly involved a matter of public concern.

speech exposing actual or potential misuse of public funds is a matter of public concern that "occupies the highest rung of First Amendment protection" (internal quotation marks omitted)).

Defendants' argument likewise misapprehends applicable law. The question before the Court is not, as Defendants appear to suggest, whether Plaintiffs were wearing a proverbial "employee hat" when they spoke up. Rather, the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. Stated differently, it is whether the subject, mode, and manner of Plaintiffs' speech were "part of the work" they were "paid to perform on an ordinary basis." *De Ritis*, 861 F.3d at 454 (internal quotation marks omitted); *compare also Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 867 (3d Cir. 2019) (holding that crime reporting of county human resources director was protected by First Amendment) ("The crime, subsequent contact with local authority figures regarding that crime, and the lack of any formal duty to report that crime are evidence that she was not experiencing or acting within the primary functions of her employment."), *with Hill v. Borough of Kutztown*, 455 F.3d 225, 242 (3d Cir. 2006) (holding that borough manager's relaying workers' harassment complaints concerning mayor to borough council was not protected speech because manager was "appointed enforcer" of relevant borough policies).

Equally uncompelling is the fact that Plaintiffs' speech was directed to Figueroa while they were on the clock. "Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction." *Garcetti*, 547 U.S. 410, 420–21 (2006) (quoting *Pickering*, 391 U.S. at 573). While Plaintiffs certainly had better

"access to [a] high-ranking county official[]" by virtue of their jobs, this context is "secondary to [the] citizen speech inquiry." *Javitz*, 940 F.3d at 865.

Having reoriented Defendants' arguments, the Court addresses the proper question of law presented, which is whether reporting on fraud and HUD violations of a high-level agency manager was part of Plaintiffs' official job duties. Notwithstanding their prior argument, Defendants' Motion appears to implicitly concede that it was not.  Even so, they proceed to argue that it was based exclusively on select lines from Plaintiffs' respective deposition testimonies.

With respect to Evangelista, Defendants point to a portion of his deposition testimony in which he stated that he had "always" reported misconduct to Figueroa in the past, even if the misconduct did not necessarily concern his department. (ECF No. 91-1 at 16.) This is not an admission of a formal job responsibility, as Defendants appear to suggest. Even if it could be construed as such, a reasonable jury hearing Evangelista's testimony could more readily conclude that his prior instances of reporting are evidence of a consistent stance against misconduct that was habitually tolerated. That is, after all, precisely what Evangelista has stated:

> I brought information of both criminal and HUD violations to Victor Figueroa on numerous occasions. During the conversations with Victor Figueroa on numerous occasions, he told me there was little he could do, because for some -- Malcom Isler, who was an employee at the Housing Authority, who was at the heart of all these, he told me on numerous occasions he had no control over [him] because of Kathryn Blackshear and Deborah Polk. So nothing was being done.

(ECF No. 96-4 at 83.) Defendants also conveniently ignore other portions of that same deposition during which Evangelista repeatedly stated that it was not his job to report on such issues. (ECF No. 96-4 at 122–24.) That is sufficient, in and of itself, to deny Defendants' Motion. *See Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("When deciding a motion for summary judgment, the court must view the facts and inferences in the light most

favorable to the nonmoving party, and must not resolve factual disputes or make credibility determinations.").

As for Fussell, Defendants also point to a single line in her deposition testimony where, in response to being asked why she went to Figueroa specifically over Isler's misconduct, she stated that it was because she had a "very good rapport" with him. (ECF No. 91-2 at 12–13.) Frankly, the Court fails to see how Fussell's feelings of trust or confidence toward Figueroa at the time conclusively establishes that she was speaking pursuant to her official duties. That an employee feels comfortable reporting internal misconduct to an agency director is perhaps the type of scenario the First Amendment can only hope for. *See Swineford v. Snyder Cnty. Pa.*, 15 F.3d 1258, 1274 (3d Cir. 1994) ("Speech involving government impropriety occupies the highest rung of First Amendment protection.").

### ii. *Corruption*

Concerning the Coleman incident, Defendants offer a nearly identical pattern of argument. For Evangelista, Defendants submit that he was "clearly speaking as a HACC employee" when he "spoke to Figueroa in Figueroa's office" about a mere "resident matter." (ECF No. 91-1 at 19.) As for Fussell, they state that her speech fell "squarely" within her role as a housing specialist because she was simply informing "her immediate supervisor" that the "resident at issue was not eligible for public housing after she performed the resident's intake evaluation."[12] (*Id.*)

For the reasons previously articulated, the Court cannot find based on these discreet lines of testimony that it was part of Plaintiffs' ordinary job duties to speak up on the corruption and

---

[12] Defendants also submit that "[t]here is no evidence that Malcom Isler wrote Fussell up, per her request." (ECF No. 91-9 at 20.) Surely this is not a serious argument.

HUD violations of a high-ranking HACC manager.[13] That conclusion is particularly warranted for Fussell, who not only protested Isler's attempts to implicate her in those violations, but had also taken it upon herself to thwart his other attempts to fast-track Coleman's application through other employees after she had refused. *Cf. Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 40 (3d Cir. 2012) (holding that reports of housing agency employee to supervisors over misuse of funds were not protected by First Amendment where job duties included the "supervision and oversight of various troubled departments" and "rooting out" financial problems).

### iii. *Theft*

The Court next addresses Plaintiffs' speech with respect to Isler's conversion of public assets. Concerning Evangelista, Defendants reason that "Evangelista spoke to Figueroa about HACC employees potentially misappropriating HACC property" and conclude that summary judgment is warranted because "it was his job to make Figueroa aware of situations like this." (ECF No. 91-1 at 22.) Glaringly, Defendants make no mention of Isler or his role in Plaintiffs' allegations. As to how precisely it was Plaintiffs' job to report on such things, Defendants again point out that Evangelista had previously reported such matters to Figueroa in the past. They also assert, without any meaningful articulation, that the theft was "related to safety and security concerns," and appear to imply that his attempts to investigate and obtain evidence of the theft

---

[13] Though not raised by Plaintiffs in their Opposition, the Court separately notes portions of Figueroa's deposition in which he stated that he first learned of the Coleman and Broomell incidents through complaints he received from the public. (ECF No. 96-8 at 216, 232.) He further explained: "[T]he residents would really like to tell on each other, or the folks that were trying to get into housing and were not able to get into housing because they were down on the waiting list, if they would see something that smelled funny to them like accusations of people accepting money to process their application, I would get phone calls." (*Id.* at 232–33.) The very fact that these complaints are at least facially analogous to Plaintiffs' speech is, in this Court's view, another reason why Defendants' Motion must be denied. *See Garcetti*, 547 U.S. at 424 (observing that speech made pursuant to a public official's job responsibilities is not protected by First Amendment because "there is no relevant analogue to speech by citizens who are not government employees").

proves that reporting the same was his official duty. (*Id.* at 18–19.) Here too, the Court is unpersuaded.

Again, Evangelista has repeatedly testified that it was not his job to investigate or report on thefts being carried out by HACC employees, much less by an upper-level agency manager. While that alone is sufficient to preclude summary judgment, the inference Defendants request is only further precluded by HACC's own human resources manager, who has stated that it was not even Evangelista's responsibility to investigate potentially illegal behavior of any HACC employee. (ECF No. 96-3 at 83.) But even if it could be fairly said that employee theft was generally "related" to safety and security, that is still not enough to place Evangelista's speech beyond the scope of the First Amendment. *Compare, e.g.*, *Lane*, 573 U.S. 228 (2014) ("[T]he critical question under *Garcetti* is [*not*] whether the speech at issue . . . merely concerns those duties."), *with Bland v. Winant*, No. 03-6091, 2007 WL 1237846, at *4 (D.N.J. Apr. 27, 2007) ("Investigating and reporting crime are the core functions of a police officer.").

With respect to Fussell, Defendants again point out that she spoke to Evangelista about the theft "in [his] office during work hours," and conclude that there is "no evidence in the record" to suggest that she was "speaking outside the normal scope of [her] employment." For the reasons already explained, this is secondary to the relevant Free Speech inquiry before the Court, and it is an insufficient basis on which to grant summary judgment. *See Javitz*, 940 F.3d at 865.

#### iv.   *Sexual Harassment*

Lastly, the Court considers Plaintiffs' speech with respect to the HACC resident's sexual harassment allegations. As to Fussell, Defendants cite to a portion of her deposition testimony in which she generally described the work of a housing specialist as one involving "many hats," and that "sometimes [she] even had to be a social worker" when, for example, residents would "come in and

cry because . . . [t]hey lost their job." (ECF No. 91-7 at 18.) Of course, the problem with Defendants' argument is that Fussell was decidedly not a social worker. Even so, Defendants reason that because it was generally her job "as a public servant" to "help residents," her speech regarding allegations of a HACC employee sexually harassing a resident was within "the scope of her daily professional activities." (ECF No. 91-1.) In this Court's view, accepting Defendants' reasoning at this stage would be to indulge the very type of concoction the Supreme Court has outright rejected. *See Garcetti*, 547 U.S. at 424 ("We reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions."). In any case, Defendants' argument fails because it also ignores critical portions of Fussell's testimony in which she unequivocally rejected the suggestion that it was part of her "regular job duties" to receive and handle resident complaints of HACC employees requesting sexual favors in exchange for services. (ECF No. 96-5 at 235.)

To the extent Evangelista previously reported unconfirmed rumors of sexual harassment to Figueroa, Defendants argue that it was simply part of his ordinary job of addressing "safety and security issues." They also appear to suggest that reporting these rumors also fell within his risk-management duties given the potential risk of civil liability HACC for the sexual exploitation being alleged. Here too, Evangelista has pointed to evidence, including his own testimony, tending to show that it was never his responsibility in either capacity to detect, investigate, or report on allegations that a HACC maintenance worker was attempting to sexually exploit a public housing resident. In fact, those responsibilities appear to have squarely fallen within Isler's purview, given that he directly supervised and oversaw all of HACC's maintenance workers, including Yelverton.

In conclusion, the Court cannot find at this stage that the relevant instances of speech in this case were ordinarily within the scope of Plaintiffs' official job duties. *See Lane*, 573 U.S. at 240. Having addressed each of the arguments set forth in their Motion, it is clear that Defendants seek summary judgment based almost exclusively on isolated, cherry-picked lines from Plaintiffs'

deposition testimonies. In doing so, Defendants invite the Court to draw tenuous inferences that are genuinely contradicted by an evidentiary record they simultaneously ignore or otherwise attempt to reinvent. Presented with that same record, a reasonable jury could find that their speech was not "part of the work" they were "paid to perform on an ordinary basis." *De Ritis*, 861 F.3d at 454 (internal quotation marks omitted). Defendants have failed to establish the absence of a genuine dispute of material fact and their Motion must accordingly be denied.[14]

### B.  First Amendment Retaliation – "Union Activity"

The Court next addresses Fussell's First Amendment retaliation claim based on her union activity. At the outset, the Court notes that the factual and legal underpinnings of Fussell's claim are not entirely clear.[15] As far as the Court can discern, Fussell claims that she was terminated for speaking with HACC employees while on leave, one of whom "happen[ed] to be [her] union president, Norman Lee." (ECF No. 96 at 32–33.) She thus concludes that Defendants retaliated against her for exercising her associational rights under the First Amendment.

---

[14] The Court acknowledges that Defendants' Motion separately seeks summary judgment on Plaintiffs' Free Speech claims insofar as they are asserted against HACC pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). However, given the number of factual disputes and credibility issues surrounding the actions of the individual Defendants, considering Plaintiffs' *Monell* claims at this stage is quite simply premature. On this particular challenge, the Court denies Defendants' Motion, but does so without prejudice to their right to renew it after a jury has been presented with special interrogatories to resolve all necessary factual disputes. *See, e.g.*, *Norman v. Haddon Twp.*, No. 1:14-CV-06034, 2017 WL 2812876, at *12 (D.N.J. June 29, 2017) (partially deferring decision on motion for summary judgment) ("At a minimum, it would be a waste of judicial resources to assess Plaintiff's [*Monell*] claims . . . based on how the jury assesses the evidence of [individual defendants'] alleged wrongdoing."); *accord Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007) (affirming that district courts may "permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity").

[15] Count III of the Amended Complaint alleges that Fussell was terminated in retaliation "for her protected union speech and association." (ECF No. 45 ¶ 104.) Yet, Plaintiff's Opposition addresses Count III as a pure associational claim. *Cf. Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (discussing legal distinction between free speech and associational claims). Moreover, Fussell has also claimed that Defendants violated her associational rights by prohibiting her from speaking to any HACC employees while on leave, which she presumes included those employees who were incidentally affiliated with her union. Here too, however, she has pointed to no evidence suggesting that Defendants were motivated by any animosity toward her union affiliation. In this Court's view, the claim she attempts to articulate here is, at best, co-extensive with her Free Speech claim.

Although the Supreme Court has recognized that public employees have a First Amendment right to freely associate with a union, *see Smith v. Ark. State Highway Emp.*, 441 U.S. 463 (1979), the constitutionally protected conduct Fussell alleges here is unfounded in the record. During her deposition, Fussell admitted to speaking to two HACC employees while on leave; neither of those individuals were Lee, as she claims. She has not submitted a sworn affidavit describing any conversation with Lee, but has rather cited to portions of the Amended Complaint in which she alleges as much. This is insufficient to stave off summary judgment. As Fussell has not otherwise pointed to any evidence suggesting that Defendants "harbored animosity toward [her] because of [her] union affiliation," *Palardy v. Twp. of Millburn*, 906 F.3d 76, 84 (3d Cir. 2018), the Court grants Defendants' Motion with respect to Fussell's claim.

## V.    CONCLUSION

For all of the reasons set forth above, Defendants' Motion for Summary Judgment is granted as to Fussell's claim for First Amendment retaliation based on union association. The remainder of Defendants' Motion is denied.

Dated: October 22, 2024

*/s/ Karen M. Williams*
KAREN M. WILLIAMS
U.S. DISTRICT COURT JUDGE