**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| GARY EVANGELISTA and KABERIA FUSSELL,<br><br>Plaintiffs,<br><br>v.<br><br>HOUSING AUTHORITY OF THE CITY OF CAMDEN, *et al.*,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 1:20-cv-16824 (KMW-EAP)<br><br>**OPINION** |

APPEARANCES:

**Matthew Moroney, Esq.**
**Jeffrey Tenthoff, Esq.**
GOLDBERG, MILLER & RUBIN P.C.
121 South Broad St., Suite 1500
Philadelphia, PA 19107

**Joseph P. Guzzardo, Esq.**
GUZZARDO & ASSOCIATES
121 South Broad St., Suite 1600
Philadelphia, PA 19107

*Counsel for Plaintiffs Gary Evangelista and Kaberia Fussell*

**Louis R. Lessig, Esq.**
BROWN AND CONNERY LLP
360 Haddon Avenue
Westmont, NJ 08108

**Andrew S. Brown, Esq.**
FISHER PHILLIPS
430 Mountain Avenue, Suite 303
Murray Hill, NJ 07974

*Counsel for Defendants Housing Authority of the City of Camden, Victoria Figueroa, Katherine Blackshear, and Deborah Person-Polk*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

This case was tried to a jury from November 3, 2025 through November 14, 2025. On November 17, 2025, the jury returned a verdict in favor of Plaintiffs Gary Evangelista and Kaberia Fussell (together, "Plaintiffs") and against Defendants the Housing Authority of the City of

Camden ("HACC"), Victor Figueroa, and Katherine Blackshear on Plaintiffs' claims that they were retaliatorily discharged in violation of the Free Speech clause of the First Amendment to the United States Constitution.[1] Judgment was entered in favor of Evangelista and against Defendants HACC, Figueroa, and Blackshear in the amounts of $510,891 for lost earnings and $750,000 for compensatory damages. The jury also awarded Evangelista punitive damages against Blackshear in the amount of $2,500. With respect to Fussell, the jury awarded compensatory damages against HACC, Figueroa and Blackshear in the amount of $450,000, and punitive damages against Blackshear in the amount of $2,500. The jury found no cause of action against Defendant Deborah Person-Polk.

Defendants now move for judgment under Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial under Federal Rule of Civil Procedure 59. Defendants' Rule 50(b) motion is premised on the assertion that the jury improperly decided questions of law that should have been decided by the Court prior to deliberations or was otherwise confused by the verdict sheet and jury charges. In the alternative, Defendants request a new trial pursuant to Rule 59, arguing that because the verdict sheet asked questions to the jury that should have been decided by the Court, the jury's state of mind was affected and the jury's subsequent answers to questions on the verdict sheet were tainted. Finally, Defendants seek a substantial remittitur of the compensatory damage award. The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons set forth below, Defendants' motion is denied to the extent Defendants seek judgment as a matter of law or a new trial, and granted insofar as Defendants request remittitur of the compensatory damage award.

---

[1] On October 22, 2024, the Court granted summary judgment in favor of Defendants on Fussell's claim for First Amendment retaliation based on union association. (Order, Dkt. No. 101.) All other claims proceeded to trial.

## II. BACKGROUND

### A. Procedural Background

This case concerns the Free Speech rights of government employees. At the time of the filing of the complaint, Plaintiffs were both former employees of the HACC.[2] Figueroa is the former Executive Director of HACC; Blackshear is the former Deputy Executive Director; and Person-Polk is the Chairperson of HACC's Board of Commissioners. Plaintiffs were fired on December 19, 2018, after they had repeatedly raised concerns over the misconduct of an upper-level HACC manager, Malcom Isler. In the year leading up to their December 2018 termination, non-party Isler was alleged to have engaged in misconduct ranging from fraud to theft. As detailed in this Court's Opinion dated October 22, 2024, Evangelista reported to Figueroa four incidents involving alleged improper conduct by Isler: (1) allowing a resident, Carol Brummell, to live in public housing without paying rent; (2) insisting that another individual, Angela Coleman, be approved for public housing when Coleman was precluded from admission into a federally assisted housing program due to past conduct; (3) directing maintenance workers to steal scrap metal from HACC's properties and sell them at a local scrap yard, and then pocketing the proceeds; and (4) supervision of a maintenance worker who was alleged to have sexually harassed a tenant, Yvonne Ortiz. (Op. 4-10, Dkt. No. 100.) Fussell also reported the incidents involving Brummell, Coleman and Ortiz to Figueroa. The crux of Plaintiffs' case is that they were suspended and then terminated in retaliation for reporting Isler's misconduct to Figueroa, due to Isler's relationship with Blackshear and Person-Polk. In addition, Evangelista claims he was terminated during the course

[2] Fussell's employment was subsequently reinstated in 2020 following arbitration. (Trial Tr. vol. 2, 252, Dkt. No. 203.)

of an investigation related to the misconduct because he refused to identify the sources that reported the misconduct to him.

Defendants moved for summary judgment on all claims. The Court granted the motion in part and dismissed Fussell's claim for First Amendment retaliation based on union association. (Op. 27, Dkt. No. 100; Order, Dkt. No. 101.) The Court denied the remainder of the motion, finding that there was a question of fact as to the scope of Plaintiffs' official job duties. (Op. 25-26, Dkt. No. 100.) The matter proceeded to trial on November 3, 2025.

On November 5, 2025, at the close of Plaintiffs' case-in-chief, Defendants made a motion pursuant to Federal Rule of Civil Procedure 50(a) to dismiss Plaintiffs' complaint. (Trial Tr. vol. 3, 395, Dkt. No. 204.) Specifically, Defendants argued that they were entitled to judgment as a matter of law because Plaintiffs failed to demonstrate that the statements that formed the basis of their First Amendment retaliation claims, and in the case of Evangelista his failure to cooperate with an investigation being conducted by the HACC, were protected speech under the First Amendment. (*Id.*) Defendants further argued that Plaintiffs failed to establish that any conduct by the individual defendants could be attributed to the HACC to support a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (*Id.*) The Court reserved decision on the motion at that time, noting that there were credibility issues concerning the reasons for the termination of Plaintiffs' employment and Plaintiffs' job responsibilities. (*Id.* at 402-03.) At the close of all the evidence, Defendants renewed their Rule 50 motion. The Court granted the renewed motion in part, dismissing all claims for punitive damages against Defendants Figueroa, HACC, and Person-Polk. (Trial Tr. vol. 9, 1065-1069, Dkt. No. 210.) The motion was otherwise denied. (*Id.*) The jury returned a verdict in favor of both Plaintiffs against Figueroa, Blackshear and the

HACC but, as noted *supra*, found no cause of action against Person-Polk. (Jury Verdict, Dkt. No. 200.)

**B. The Verdict Sheet and Jury Charges**

Prior to trial, each party provided the Court with proposed jury charges and a proposed verdict sheet. (Dkt. Nos. 165, 166-1, 170, 172.) Relevant to the instant motion, the proposed verdict sheet submitted by Defendants included the following questions:

> **Question 1B:**
>
> Did Plaintiff Gary Evangelista engage in protected activity by way of speech related to Malcom Isler in his position as Director of Security/Risk Management for the Housing Authority?
>
> Yes ________ No ________ Vote _______
>
> **Question 1C:**
>
> Was Plaintiff Gary Evangelista's protected activity a motivating factor in his termination of employment from the Housing Authority?
>
> Yes ________ No ________ Vote _______
>
> **Question 2B:**
>
> Did Plaintiff Kaberia Fussell engage in protected activity by way of speech related to Malcom Isler in her position as Housing Specialist for the Housing Authority?
>
> Yes ________ No ________ Vote ________
>
> **Question 2C:**
>
> Was Plaintiff Kaberia Fussell's protected activity a motivating factor in her termination of employment from the Housing Authority?
>
> Yes ________ No ________ Vote _______

(Proposed Verdict Sheet, Dkt. No. 166-1.)

On November 13, 2025, the Court conducted a conference concerning the jury charges and the form of the verdict sheet. (Trial Tr. vol. 8, 1046-1061, Dkt. No. 209.) The parties revised the

proposed jury charges and verdict sheet following the conference and submitted them by email to the Court later that evening. The charge conference continued on November 14, 2025 to address the final form of the jury charges and verdict sheet. (Trial Tr. vol. 9, 1074-1091, Dkt. No. 210.) The final verdict sheet, prepared by counsel consistent with input from the Court, provided in relevant part as follows:

> **Question 1A:**
>
> Was Plaintiff Gary Evangelista's actions in reporting matters related to the misconduct of Director of Asset Management Malcolm Isler a matter of public concern?
>
> Yes ________ No ________
>
> **Question 1B:**
>
> Was it within Plaintiff Gary Evangelista's job duties to report the misconduct of Director Malcolm Isler?
>
> Yes ________ No ________
>
> **Question 1C:**
>
> Do you believe, factually, that Mr. Evangelista's refusal to identify the sources of his information related to Ortiz's complaint was within the scope of his employment?
>
> Yes ________ No ________
>
> **Question 1D:**
>
> Do you find that Mr. Evangelista's termination as it relates to his refusal to identify the sources of his information violated his First Amendment Rights?
>
> Yes ________ No ________

(Jury Verdict, Dkt. No. 200.) The verdict sheet contained similar questions as Questions 1A and 1B with respect to Fussell. (*Id.*)

The final jury charges, which in relevant part were nearly identical to the proposed jury charges submitted by Defendants by email on November 13, 2025, included the following language:

> It is my duty to instruct you on whether Evangelista and Fussell engaged in activity that was protected by the First Amendment. In this case, I instruct you that the following activity was protected by the First Amendment:
>
> *Plaintiff Gary Evangelista reported the following misconduct attributable to Director of Asset Management Malcolm Isler to Executive Director Victor Figueroa: 1) Carol Brummell; 2) Theft of Scrap Metal; 3) Angela Coleman; and 4) Yvonne Ortiz's resident complaint. Plaintiff Kaberia Fussell reported the following misconduct attributable to Director of Asset Management Malcolm Isler to Executive Director Victor Figueroa: 1) Carol Brummell; 2) Angela Coleman; and 3) Yvonne Ortiz's resident complaint.*
>
> In the rest of this instruction, I will refer to these events as "Evangelista and Fussell's protected activity."

(Jury Charges 16, Dkt. No. 189.)[3] Neither party objected to the jury charges or verdict sheet, nor did either party raise an issue that the jury charges and verdict sheet were inconsistent, before the jury retired to deliberate. The jury found in favor of Plaintiffs and awarded a total of $1,715,891 in damages.

### C. The Parties' Arguments

Now pending before the Court is Defendants' post-trial motion for judgment as a matter of law or, in the alternative, for a new trial. Defendants argue that the relief they seek is justified not only because the evidence presented at trial is insufficient to support the verdict, but also because

[3] The only difference between Defendants' proposed language and the final form of the jury charges with respect to this instruction was that each area of speech was described more generically in the final charge: "1) Carol Brummell; 2) Theft of Scrap Metal; 3) Angela Coleman; and 4) Yvonne Ortiz's resident complaint." (Jury Charges 17, Dkt. No. 189.) Defendants' proposed instruction provided some additional detail: "1) Carol Brummell's non-payment of rent; 2) Theft of Scrap Metal; 3) Angela Coleman's placement into a unit in violation of HUD's One-Strike Rule; and 4) Yvonne Ortiz's resident complaint." (11/13/25 E-mail from Joseph D. Clifford, Esq.)

the Court erred by allowing the jury to resolve a legal question. Specifically, Defendants contend that the issue of whether Plaintiffs' speech was protected under the First Amendment was a question of law that should have been decided by the Court and not presented to the jury for resolution. (Defs.' Br. 8-10, Dkt. No. 212-1.) Defendants note that the jury charges expressly informed the jury that the Court had already determined that Evangelista's speech on four topics – Brummell, Coleman, scrap metal, and Ortiz's resident complaint – was protected by the First Amendment, and that Fussell's speech on three topics – Brummell, Coleman, and Ortiz's resident complaint – likewise was protected by the First Amendment. (*Id.* at 6, 9.) Defendants assert that the jury was confused because they were asked to determine the protected activity when such issue was already decided by the Court. (*Id.* at 9.) Defendants also note that the verdict sheet did not ask the jury whether Plaintiffs' speech was a substantial or motivating factor in the alleged retaliatory action, when their proposed verdict sheet included such questions. (*Id.* at 9-10.)

Plaintiffs oppose the motion on the basis that Defendants' failure to object to the verdict sheet and jury charges precludes their ability to challenge the verdict on such grounds at this time. (Opp'n Br. 1-2, Dkt. No. 217.) Plaintiffs note that Defendants not only consented to the jury charge that included the Court's determination that certain speech is protected by the First Amendment but also requested a similar question in the verdict sheet they proposed prior to trial, and they only now complain that the charge, when read in conjunction with the verdict sheet, created confusion. (*Id.* at 7.) Plaintiffs argue that Defendants' failure to object to the verdict sheet or jury charges operates as a waiver of any right to seek post-trial relief. (*Id.* at 7-9.) Further, Plaintiffs assert that Defendants provide no evidence that the jury was confused, particularly given that the jury's finding was consistent with the instruction that the speech at issue is protected under the First Amendment, and thus no basis to find "plain error" in the verdict sheet. (*Id.* at 9-10.) In connection

with Defendants' request for judgment as a matter of law, Plaintiffs contend that Defendants have asked the Court to view the evidence in the light most favorable to Defendants, when the appropriate standard requires the Court to view the evidence in the light most favorable to Plaintiffs as the non-moving party. (*Id.* at 13-14.) When viewed through this lens, Plaintiffs assert that there was sufficient evidence to support the jury's verdict. (*Id.* at 23.) Finally, Plaintiffs argue that the compensatory damage award should not be amended because the award is commensurate with emotional distress damage awards in other cases and is not "so unreasonable as to offend the conscience of the Court." (*Id.* at 35-38.)

In reply, Defendants assert that they did not waive any challenges regarding the verdict sheet and jury charges because issues were "brought to this Court's attention throughout trial," though Defendants do not point to any specific objections in the record. (Defs.' Reply 1, Dkt. No. 219.) Defendants further argue that should the Court deem their acquiescence as to the form of the jury charges and verdict sheet to be a waiver, they are entitled to a plain error analysis. (*Id.* at 4-5.) Defendants also argue that the verdict sheet asked whether Evangelista's refusal to identify sources of information was within his job duties, but there was no instruction in the jury charges on this issue. (*Id.* at 6.) Defendants contend that judgment as a matter of law should be granted, or a new trial ordered, because the evidence of record supports a verdict in their favor. (*Id.* at 10.) Lastly, Defendants assert that the weight of the evidence, in light of the limited quality and quantity of evidence of emotional distress presented at trial, as compared to the size of the compensatory damage award, warrants remittitur or a new trial on damages. (*Id.* at 13.)

## III. LEGAL STANDARDS

### A. Rule 50

A motion for judgment as a matter of law may be made after a party has been fully heard on an issue during a jury trial and prior to the case being submitted to the jury. FED. R. CIV. P. 50(a). A motion for judgment as a matter of law pursuant to Rule 50(a) "'should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). "[W]hile a district court is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006). Rather, the court may in its discretion deny a Rule 50(a) motion and submit the case to the jury. *Id.*

If the court does not grant a motion as a matter of law pursuant to Rule 50(a), the movant may file a renewed motion for judgment as a matter of law no later than 28 days after the entry of judgment or, if the motion addresses a jury issue not decided by a verdict, within 28 days after the jury was discharged. FED. R. CIV. P. 50(b). Judgment as a matter of law pursuant to Rule 50(b) "should only be granted if 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Raiczyk v. Ocean Cnty. Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)); *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that

party."). In reviewing the evidence, the court must "expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." *Dudley v. S. Jersey Metal, Inc.*, 555 F.2d 96, 101 (3d Cir. 1977) (internal quotation omitted). A Rule 50(b) motion can only be made on grounds specifically advanced in a motion for a directed verdict pursuant to Rule 50(a). *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989).

**B. Rule 59**

Federal Rule of Civil Procedure 59(a) provides: "The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . [.]" FED. R. CIV. P. 59(a)(1). "Although Fed. R. Civ. P. 59 does not enumerate the grounds for a new trial, the following have been recognized as general grounds for a new trial: the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions." *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992) (internal quotation and citation omitted), *aff'd*, 4 F.3d 1153 (3d Cir. 1993). However, "[u]nless justice requires otherwise, no error . . . by the court or a party [] is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order[,]" for "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61. The decision whether or not to grant a new trial is committed to the "sound discretion" of the court. *See Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995).

### C. Rule 51

The Federal Rules of Civil Procedure impose upon a party the affirmative duty to raise an objection to a jury charge or verdict before the jury retires. *See* FED. R. CIV. P. 49, 51. Under Rule 49, "[a] party waives the right to a jury trial on any issue of fact . . . not submitted to the jury unless, before the jury retires, the party demands its submission to the jury." FED. R. CIV. P. 49(a)(3). Under Rule 51, a party is required to make an objection to an instruction or on the failure to give an instruction "on the record, stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). The objecting party is required to object prior to the jury being charged, or, if the party was not informed of an instruction before the opportunity to object, then an objection must be raised "promptly after learning that the instruction or request will be, or has been, given or refused." FED. R. CIV. P. 51(c)(2). Although the Third Circuit has not explicitly stated that Rule 51's requirements extend to jury verdict sheets as well as jury charges, the Third Circuit has applied a Rule 51 waiver to jury verdict sheets. *See, e.g., Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 191 n.19 (3d Cir. 2015) ("The Appellants may also have waived their inconsistency-challenge pursuant to Rule 51 by failing to raise any objection to the content of the jury instructions and verdict form, both of which authorized the jury to make the findings that Appellants now complain are inconsistent."); *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 340 (3d Cir. 2005) (failure to object to either court's instructions or verdict sheet constitutes a failure to preserve the objection). In addition, several circuit courts have expressly applied Rule 51 to jury verdict sheets. *See Moore v. Tennessee*, 267 F. App'x 450, 454 (6th Cir. 2008) (noting that Sixth, Eighth, Second and First Circuits apply Rule 51 to jury verdict forms).

"Rule 51 serves an important function in ensuring orderly judicial administration and fairness to the parties" because the court may be "informed in precise terms of any objections to proposed instructions" and has "an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 274 (1981) (internal citation and quotation omitted). "Moreover, the Rule prevents litigants from making the tactical decision not to object to instructions at trial in order to preserve a ground for appeal." *Id.*

Thus, when a party fails to preserve an objection to a jury instruction or verdict sheet, a court may only consider a plain error "if the error affects substantial rights." FED. R. CIV. P. 51(d)(2). Under the plain error standard, the court considers, *inter alia,* the "obviousness of the error, the significance of the interest" involved, and "the reputation of judicial proceedings if the error stands uncorrected." *Franklin Prescriptions,* 424 F.3d at 340 (internal citations and quotations omitted). Plain error is error that is "'fundamental and highly prejudicial, such that the instructions failed to provide the jury with adequate guidance and [the court's] refusal to consider the issue would result in a miscarriage of justice.'" *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187 (3d Cir. 2019) (quoting *Franklin Prescriptions*, 424 F.3d at 339). "Plain error review is discretionary—it should be exercised sparingly and should only be invoked with extreme caution in the civil context." *Franklin Prescriptions,* 424 F.3d at 341 (internal citations and quotations omitted).

In *Robinson v. First State Community Association*, the Third Circuit considered whether a party's failure to object to an erroneous jury instruction operated as a waiver of the objection or forfeiture of the objection. *Robinson*, 920 F.3d at 186. The Third Circuit stated that a court may review an erroneous jury instruction under a plain error standard if the objection was forfeited, but

waived arguments may not be resurrected. *Id.* at 187. As defined by the Third Circuit, "[f]orfeiture is the 'failure to make the timely assertion of a right[,]'" whereas "[w]aiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 146 (3d Cir. 2017)).

### D. Remittitur

"'[T]he remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive.'" *Cortez v. Trans Union, LLC*, 617 F.3d 688, 715 (3d Cir. 2010) (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)). "While courts often use the term 'remittitur' to refer to any reduction in a damages award, including one which is imposed to satisfy constitutional due process concerns, the term is actually far more specific." *Id.* at 716. "'A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts.'" *Id.* (quoting *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999)). "'A constitutional reduction, on the other hand, is a determination that the law does not permit the award" and the court has "a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.'" *Id.* (quoting *Johansen*, 170 F.3d at 1331). The Third Circuit has noted that when a court reduces a damages award that it finds constitutionally excessive, the award is reduced as a matter of law without interference with the plaintiff's right to have the jury make such determination. *Id.* By contrast, when the court exercises its discretion in reducing a verdict as inconsistent with the evidence, "the court must offer a new trial as an alternative to a reduction in the award in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial." *Id.*

Remittitur may be proper where the court concludes that the evidence was too speculative to support the damages awarded by the jury, *Spence*, 806 F.2d at 1201, or where a damages award "was contrary to all reason and . . . shock[s] the conscience of the court." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771-72 (3d Cir. 1987). A jury award shocks the conscience of the court when it bears no rational relationship to the evidence presented at trial. *Id.* at 773. In contemplating a motion for remittitur, the court must "review a damage award to determine if it is rationally based" and "issue a remittitur where it is not." *Farrington v. Freedom Mortg. Corp.*, No. 20-4432, 2024 WL 2260976, at *2 (D.N.J. May 17, 2024) (internal citations and quotations omitted), *appeal dismissed*, No. 24-2072, 2024 WL 5237518 (3d Cir. Nov. 1, 2024). "'If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages.'" *Id.* (quoting *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 620 (E.D. Pa. 1998)). In overturning a jury verdict for excessiveness, the court may order a new trial without qualification or "conditioned on the verdict winner's refusal to agree to a reduction[.]" *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 433 (1996).

## IV. DISCUSSION

### A. First Amendment

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend. I. "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). Consistent with this spirit, the Free Speech Clause—which has been incorporated against the States through the Fourteenth Amendment—generally prohibits

government interference with "free and unhindered debate on matters of public importance[.]" *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573 (1968). Likewise, it "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out[.]" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citations omitted). At the same time, courts recognize that the government, as an employer, has a countervailing interest "in maintaining control over [its] employees' words and actions for the proper performance of the workplace.",*Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 987 (3d Cir. 2014).

In *Pickering*, the Supreme Court recognized that citizens who accept public employment do not surrender their First Amendment rights. *See Lane*, 573 U.S. at 231. "To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty*, 772 F.3d at 986. The first factor is a question of law, while the second and third factors are questions of fact. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004).

In connection with the first factor, *i.e.*, whether the speech is protected by the First Amendment, a public employee's statement is protected when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). As to the first prong, an individual acts as an employee, rather than as a citizen, when "the speech at issue is itself ordinarily within the scope of an employee's duties[.]" *Lane*, 573 U.S. at

240. As to the second prong, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 241 (internal citations and quotations omitted). Finally, the third prong requires a balancing of the employee's and the employer's interests under *Pickering*. *Dougherty*, 772 F.3d at 987.

Courts have generally noted that the question of whether speech is protected by the First Amendment is a question of law. *Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005). However, with respect to the first prong of this inquiry, the question of "'[w]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law.'" *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (quoting *Dougherty,* 772 F.3d at 988). The Supreme Court has noted that the "proper inquiry" regarding the scope of an employee's duties is "a practical one." *Garcetti*, 547 U.S. at 424. The inquiry is not based on "formal job descriptions," but rather is a "fact-intensive" inquiry that requires consideration of the "duties an employee actually is expected to perform[.]" *Id.* at 424-425; *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007) (noting that "the question of whether a particular incident of speech is made within a particular plaintiff's job duties" is a "fact-intensive" inquiry), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011). Thus, "the scope and content of a plaintiff's job responsibilities is a question of fact[.]" *Flora*, 776 F.3d at 175. "[T]he ultimate constitutional significance of those facts is a question of law." *Id.* When an inquiry presents a mixed question of law and fact, "it often will be inappropriate to take the question from the jury." *Harbor Tug & Barge Co. v. Papai,* 520 U.S. 548, 554 (1997).

**B. Verdict Sheet**

Defendants contend that the verdict sheet should not have asked the jury to determine whether Plaintiffs' speech was a matter of public concern or whether the speech was within Plaintiffs' job duties, because these issues have been "unequivocally recognized as questions of law for the Court and not questions of fact for the jury." (Defs.' Br. 6.) Defendants also contend that the verdict sheet failed to ask jurors whether Plaintiffs' speech was a motivating factor in the decision to terminate their employment. (*Id.* at 10.)

The verdict sheet initially proposed by Defendants asked jurors to determine whether each plaintiff engaged in protected activity. Specifically, proposed Questions 1B and 2B asked: "Did Plaintiff Gary Evangelista engage in protected activity by way of speech related to Malcom Isler in his position as Director of Security/Risk Management for the Housing Authority?" and "Did Plaintiff Kaberia Fussell engage in protected activity by way of speech related to Malcom Isler in her position as Housing Specialist for the Housing Authority?" (Proposed Verdict Sheet, Dkt. No. 166-1.) By proposing jury questions on an issue that they now contend should never have been presented to the jury, Defendants invited any error in the verdict sheet and waived any challenge to the verdict sheet at this time. *See Sands v. Wagner*, 314 F. App'x 506, 509 (3d Cir. 2009) (where jury charges included erroneous burden of proof, Third Circuit rejected challenge to jury charges, even though challenge was "technically correct," because defendants "invited error" by submitting proposed jury instructions that did not include instruction on proper burden of proof).

Even if Defendants' proposed verdict sheet does not constitute a waiver, their silence constitutes forfeiture of any objection. Defendants did not assert error in the verdict sheet until the filing of this post-trial motion. After substantial discussion with the parties about the form of the verdict sheet, the Court informed the parties that if they had any objections to the final form, such

objections were to be noted on the record. (Trial Tr. vol. 9, 1164, Dkt. No. 210.) Defendants did not raise any objections to the verdict sheet before it was given to the jury, either with respect to the inclusion of questions addressing whether Plaintiffs' speech was protected by the First Amendment or with respect to the exclusion of a question regarding whether Plaintiffs' speech was a motivating factor in the adverse action of termination. By failing to object to the wording on the verdict form or to the responses provided by the jury before the jury was discharged, Defendants forfeited any argument concerning the verdict sheet.

### C. Jury Charges

Prior to trial, each party submitted proposed jury charges which generally followed the Third Circuit's Model Jury Instructions. Defendants' proposed instruction on the issue of First Amendment Retaliation provided as follows:

> It is my duty to instruct you on whether Evangelista and Fussell engaged in activity that was protected by the First Amendment. In this case, I instruct you that the following activity was protected by the First Amendment:
>
> [Describe protected activity][FN] In the rest of this instruction, I will refer to these events as "Evangelista and Fussell's protected activity."

(Proposed Jury Instructions 42, Dkt. No. 165-1.) The footnote noted that the protected activity to be described in the bracketed text was "subject to proofs submitted at trial as to whether Plaintiffs' claimed activity is protected." (*Id.* at p. 42 n.3.) On November 13, 2025, following the close of all of the evidence, Defendants submitted a revised proposed instruction which, as noted above, was utilized by the Court nearly verbatim in the final version of the jury charges. (Trial Tr. vol. 9, 1084, Dkt. No. 210.)[4]

---

[4] Again, the only difference between Defendants' proposed language and the final form was that each area of speech was described more generically in the final charge: "1) Carol Brummell; 2) Theft of Scrap Metal; 3) Angela Coleman; and 4) Yvonne Ortiz's resident complaint." (Jury Charges 17, Dkt. No. 189.)

Defendants now complain that the jury charges were inconsistent with the verdict sheet and thereby confused the jury. Defendants did not object to the jury charges and, moreover, do not appear to presently assert that such instructions were erroneous. Indeed, Defendants argue that "[t]he question of whether the speech was a matter of public concern . . . was already answered by the Court by operation of reading and submitting the Jury Charges to the jury." (Defs.' Br. 9.) Likewise, Defendants assert that "[t]he Jury Charges clearly set forth what the Court had already determined as Plaintiffs' protected activity[.]" (*Id.*) Further, Defendants note that the issue of whether the reporting of misconduct by Isler was within each plaintiff's job duties "was already decided by the Court when it clearly identified what was Plaintiffs' protected activity." (*Id.*) In light of Defendants' continued reliance on the jury charges, the Court perceives Defendants' challenge to the verdict sheet rather than the jury charges. However, to the extent Defendants contend that the charges were erroneous in this regard, the Court finds that Defendants waived such challenge by proposing the language of the jury charges and continuing to affirmatively argue that such instructions are proper.[5]

### D. Motion for Judgment as a Matter of Law

As set forth above, a party may not raise in a Rule 50(b) motion grounds that were not advanced in a motion pursuant to Rule 50(a). Defendants' present challenges to the verdict sheet and/or jury charges were not raised by way of motion pursuant to Rule 50(a) and cannot now serve as the basis for a Rule 50(b) motion.

[5] With respect to Defendants' assertion that the jury charges did not include any discussion of whether Evangelista's refusal to identify the sources of information concerning Isler's misconduct was within the scope of his employment, Defendants' proposed instructions contained no language in this regard, and any challenge to the instructions on this basis was forfeited.

Nonetheless, insofar as Defendants seek to renew the arguments made in their Rule 50(a) motion based on the evidence at trial and not based on the verdict sheet, the Court may address the issue under Rule 50(b). Defendants contend that the Court should conclude, based upon the cumulative testimony detailing Plaintiffs' actual job duties and responsibilities, that the reporting of misconduct of Isler fell within each plaintiff's job duties. (Defs.' Br. 11.) Defendants assert that "in determining whether the alleged activity is protected speech or is instead within the Plaintiffs' job duties as well as responsibilities," the testimony establishes that such conduct falls within their respective job duties. (*Id.* at 12.)

The Court is perplexed by the internally inconsistent positions taken by Defendants within this motion, as Defendants argue both that the Court already properly determined, as set forth in the jury charges, that Plaintiffs' speech was protected under the First Amendment, but also that the Court should determine at this time that Plaintiffs' speech was not protected. In this regard, as discussed *supra*, Defendants state in their brief that "[t]he Jury Charges clearly set forth what the Court *had already determined* as Plaintiffs' protected activity[.]" (Defs.' Br. 9) (emphasis added). Moreover, Defendants assert that "[t]he question of whether the speech was a matter of public concern . . . *was already answered by the Court* by operation of reading and submitting the Jury Charges to the jury." (*Id.* at 9) (emphasis added). Likewise, Defendants note that "whether the reporting of misconduct regarding Isler was within each Plaintiffs' [sic] job duties" was "*already decided by the Court* when it clearly identified what was Plaintiffs' protected activity." (*Id.*) (emphasis added). Further, Defendants contend that the protected activity "was already laid out" for the jury. (*Id.*)

Notwithstanding Defendants' continued reliance on jury charges which they submitted and which state that Plaintiffs' speech constituted protected activity under the First Amendment,

Defendants now ask the Court to find that Plaintiffs' speech is not protected under the First Amendment because the weight of the evidence supports a finding that the speech at issue falls within each plaintiff's job duties. (Defs.' Br. 9, 11.) Having submitted and relied on jury charges that concede that Plaintiffs' speech was protected by the First Amendment, and having argued in this motion that the instruction was appropriate and that this issue has already been decided by the Court, Defendants have waived any right to have the Court re-visit this issue by way of post-trial motion.

Even if the Court were to find that Defendants have not waived their arguments, the application fails on the merits. At present, Defendants dispute only whether Plaintiffs were speaking as citizens or as employees of the HACC when they reported Isler's misconduct and whether the *Pickering* balancing test weighs in favor of Plaintiffs; they do not argue that the speech was not a matter of public concern.[6] (Defs.' Br. 11-19.) Defendants argue that there is no evidence from which the jury could find that Plaintiffs' reporting of the corruption of Malcolm Isler fell outside of the scope of their job duties. This argument is belied by the record.

---

[6] While Defendants point out that a First Amendment retaliation analysis also requires the Court to determine whether the speech at issue is a matter of public concern, they make no argument as to why Plaintiffs' speech does not involve a matter of public concern. Defendants note only that if Plaintiffs' speech was not within their official job duties, then the Court must proceed to analyze whether the citizen spoke on a matter of public concern and, further, that if the Court is satisfied that Plaintiffs spoke on a matter of public concern, then the Court must also conduct a balancing test under *Pickering*. (Defs.' Br. 17-18.) Having proffered no argument as to why the speech at issue is not a matter of public concern, the Court finds no basis to find in Defendants' favor as to this element. Moreover, the Court already determined in its Opinion dated October 22, 2024 that "reporting on fraud and HUD violations of a high-level agency manager" is "undoubtedly . . . a matter of public concern." (Op. 19 n.11, Dkt. No. 100.) Likewise, the Court finds more generally that reporting corruption of a high-level agency manager at the HACC involves a matter of public concern. *See Lane*, 573 U.S. at 241 ("Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.") (internal citations and quotations omitted).

Defendants contend that the Third Circuit has "consistently held" that reporting misconduct of another employee up the chain of command is, as a matter of law, within an employee's official job duties. (Defs.' Br. 11.) Defendants' argument misapprehends applicable case law. While the Third Circuit, in an unpublished decision, stated that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties[,]" *Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012), the Third Circuit has also made explicit that "whether a particular incident of speech is made within a particular plaintiff's job duties" is a "fact-intensive" inquiry. *Foraker*, 501 F.3d at 240. In deciding whether the speech at issue, when made up the chain of command, is protected under the First Amendment, the Third Circuit has considered whether the responsibility for communicating the speech was a part of the plaintiff's typical workplace duties. *See id.* (plaintiffs "were acting within their job duties when they expressed their concerns up the chain of command because they needed to have a functioning bullet trap to conduct their educational programs and it was their special knowledge and experience with the bullet trap that demonstrated their responsibility for ensuring its functionality by reporting problems to their superiors"); *see also Morris,* 487 F. App'x at 40 ("[r]eporting instances of misconduct and advising Greene on the legality of his course of action were responsibilities that logically fell within Morris's duties as Green's Executive Assistant and as a supervisor" where his "admitted job duties clearly include the oversight of TSSI and rooting out of financial, as well as other, problems at PHA"); *Hill*, 455 F.3d at 242 (employee's reports to superiors about harassment were not protected speech where plaintiff conceded that "he reported Marino's conduct and harassing actions to the Borough [Council] 'pursuant to his official duties'").

Thus, the relevant inquiry for purposes of a First Amendment inquiry is not whether the speech at issue was made up the chain of command. Rather, the critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, including whether it was the employee's duty or responsibility to report the misconduct of upper-level management up the chain of command. As the Court discusses *infra,* several witnesses testified at trial that reporting the misconduct of Isler was not within either plaintiff's job duties.

**1. Evangelista**

Evangelista, the Director of Security and Risk Manager, testified that his job duty "was mainly dealing [with] and manning three highrises with security guards, and [he] was responsible 24 hours, seven days a week for that, as well as doing their payroll." (Trial Tr. vol. 2, 294, Dkt. No. 203.) He testified that he "would also drive around the sites to report hazardous situations that could be anywhere from abandoned vehicles to trash." (*Id.*) He further testified that he was involved with "risk management" which required him "to make sure all the insurance policies on the properties were up-to-date as well as the automotive insurance[.]" (*Id.* at 295-96.) Evangelista stated that he would work with the insurance company to report claims, the most common of which were "trip and falls" and car accidents, as well as property damage. (*Id.* at 296.) Evangelista testified that he did not work as a police officer or detective "solving crimes for the Housing Authority" and was not involved in internal affairs investigations at the HACC. (*Id.* at 297.) He also stated that he did not do investigations but, in connection with his "risk management duties," he provided information to people who performed investigations. (Trial Tr. vol. 3, 344, Dkt. No. 204.)

John Kostyal, the director of Human Resources at the HACC, testified at trial that Evangelista's job duties and responsibilities included: "[t]he overall security . . . and also to address

any security issues and also insurance related issues pertaining to the properties and also the insurance issues relating to the management of the fleet vehicles that we had." (Trial Tr. vol. 7, 791, Dkt. No. 208.) He stated that in his role as Director of Security and Risk Manager, Evangelista may have needed "to gather information to be able to present it to the executive director" if he "receive[d] knowledge of risk management activities or security issues[.]" (*Id.* at 859.) Kostyal did not directly answer the question whether it was Evangelista's job "to investigate and report on potentially illegal behavior by other employees at the Housing Authority[.]" (*Id.*) At trial, however, Plaintiffs' counsel questioned Kostyal on his prior deposition testimony:

> Sir, I'd like to just review some of your testimony really quick first. . . . [o]n page 82, line 19:
>
> Q. "And did you consider it part of Mr. Evangelista's job to investigate potentially illegal behavior by employees at the Housing Authority?" What was your response?
>
> A. "Not in my opinion."
>
> Q. And then the answer goes on.
>
> A. "Not in my opinion, no."
>
> Q. And your answer at the time was truthful, correct?
>
> A. Based on how the question is phrased, yes.

(*Id.* at 860.)

Blackshear, who was Evangelista's direct supervisor, testified that Evangelista's duties included driving around the various housing sites to look for criminal activity, which he would report to the local police if observed; report abandoned cars or trash so they could be removed from the premises; manage the staffing and payroll of the security guards; and dealing with insurance claims. (Trial Tr. vol. 5, 463, 488-89, Dkt. No. 206.) She further testified that HACC

employees were not required to bring allegations of illegal conduct to Mr. Figueroa, the executive director of the HACC, because they "should have brought it to" Blackshear first. (*Id.* at 489-90.)

Lisa Richardson, a prior staff attorney for the HACC, testified as to her understanding of Evangelista's job duties: "Basically he would address the risk management issues, so sometimes I might confer with him concerning that area. As far as security, he oversaw some of the security agents in the buildings." (Trial Tr. vol. 8, 883, Dkt. No. 209.)

To be sure, there was testimony at trial to suggest that reporting the misconduct of Isler fell within Evangelista's role as "risk manager." For example, Evangelista testified as follows:

Q. Was the Ortiz matter a potential risk for the Housing Authority?

A. If the allegations were true, Yes.

Q. Would that require you as the risk manager to address the situation?

A. It would require me to notify Victor Figueroa, which I did.

Q. Which is all part of your job?

A. To make them aware of incidents, yes; to investigate them, no.

(Trial Tr. vol. 3, 353-54, Dkt. No. 204.) Evangelista also testified as to a statement he read to the Board of Commissioners, in which he indicated that he brought to Figueroa's attention issues concerning "potential thefts at Branch Village and at Ablett Village" and "a potential quid pro quo sex issue" because "[e]ach of these were potentially serious matters involving illegal conduct that, if true, exposed the Housing Authority to significant liability." (*Id.* at 349.) Moreover, Sadyhe Bradley, former general counsel of the HACC, testified that Evangelista's job duties included handling "any questions or any matters related to security and/or risk management[.]" (Trial Tr. vol. 8, 906-07, Dkt. No. 209.)

Thus, Defendants produced at trial some evidence from which a jury could conclude that reporting the misconduct of Isler fell within Evangelista's job duties. However, the Court is required to construe all of the evidence, together with all reasonable inferences therefrom, in Plaintiffs' favor and decide whether the record is "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Raiczyk*, 377 F.3d at 269 (internal citation and quotations omitted). In light of the entire record in this case, viewed in a light most favorable to Plaintiffs, there was sufficient evidence for the jury to conclude that Evangelista's job duties and responsibilities as Director of Security and Risk Manager did not require him to report the misconduct of Isler. The evidence in Evangelista's favor was not overwhelming,[7] but it was sufficient for a jury to properly find a verdict in his favor.

**2. Fussell**

Fussell testified that her job duties as a Housing Specialist were to determine the eligibility of housing applicants by running their credit and criminal backgrounds and ensuring that their wages qualified them for low-income housing. (Trial Tr. vol. 2, 235, Dkt. No. 203.) Once an

[7] Defendants note that Jury Note #3 asked "What were Gary's job duties?" (Defs.' Br. 9; Jury Notes #3, Dkt. No. 194.) Defendants now ask the Court to find as a matter of law that the scope and content of Evangelista's job responsibilities were established at trial and that reporting the misconduct of Isler fell within those job duties. Although Evangelista's job title as "Director of Security and Risk Manager" suggests that reporting the misconduct of Isler would be within his ordinary job duties, the inquiry concerning the scope of his job duties requires consideration of "the duties an employee actually is expected to perform" and not the job title alone. *See Garcetti*, 547 U.S. at 424–25. If a job title alone was dispositive of the scope of Evangelista's job duties, the inquiry would be a closer call. However, in light of the facts elicited at trial concerning Evangelista's job duties, and as evidenced by Jury Note #3, neither party conclusively established the scope of such duties. Thus, Evangelista's job duties remained in dispute, and it was within the province of the jury, not the Court, to make a factual finding as to the scope of such duties. *Cf. De Ritis v. McGarrigle*, 861 F.3d 444, 452 n.4 (3d Cir. 2017) ("Granted, whether speech is protected turns on a 'mixed question of fact and law' when a dispute exists over '[w]hether a particular incident of speech is made within a particular plaintiff's job duties.' But the scope and content of De Ritis's job responsibilities is undisputed here, so whether De Ritis's statements qualify as protected speech is a purely legal question.") (quoting *Flora*, 776 F.3d at 175).

applicant was deemed eligible for housing, Fussell then inspected the housing unit to make sure it meets all applicable city and federal codes. (*Id.* at 236.) Fussell also calculated the amount of rent to be charged to the tenant based upon the applicant's income. (*Id.* at 237.) Consistent with Fussell's testimony, Figueroa testified that a "housing specialist" is "someone that does intake for a prospective housing resident, makes sure that the information that's acquired is correct and follows through with the housing of that individual if they are deemed eligible." (Trial Tr. vol. 6, 595, Dkt. No. 207.) Kostyal likewise testified that Fussell's job duties and responsibilities included maintaining applications, meeting with applicants to determine the projected rent, running background checks, and "when the unit was ready, she would be able to take one of those successful applicant[s] [to] work with the property manager to schedule a date and time for the lease signing and move that packet then over to that public housing department for them to take over." (Trial Tr. vol. 7, 792-93, Dkt. No. 208.) Lastly, Bradley testified that Fussell's duties as a housing specialist were to "interact[] with applicants who were coming into the Housing Authority, those applying to be residents of the Housing Authority, essentially." (Trial Tr. vol. 8, 907, Dkt. No. 209.)

Defendants' attempt to define Fussell's speech in terms of routine, housing-related matters, such as a tenant who failed to pay rent (Brummell), or a tenant who did not meet the eligibility requirements for public housing (Coleman), or "reporting of a resident safety issue" (Ortiz), is disingenuous. (Defs.' Br. 16-17.) The Court already rejected this "exceedingly myopic view" in its October 22, 2024 Opinion. (Op. 19, Dkt. No. 100.) The relevant inquiry is not whether the underlying housing matters were within Fussell's job duties but rather whether reporting Isler's misconduct in connection with these housing matters was within her job duties. Other than their argument that reporting misconduct of other employees up the chain of command is *per se* within

any employee's job responsibilities, which this Court rejects for the reasons already discussed, Defendants cite no evidence to support their contention that Fussell's job responsibilities included an obligation to report the misconduct of Isler. In light of the entire record in this case, and viewing the evidence in a light most favorable to Plaintiffs, the jury had sufficient evidence to conclude that Fussell's job duties and responsibilities as a Housing Specialist did not require her to report the misconduct of Isler.

### 3. *Pickering* Balancing Test

Defendants maintain that even if Plaintiffs acted as citizens and engaged in speech that was a matter of public concern, Defendants' interests outweigh Plaintiffs' interests in a *Pickering* analysis. Defendants concede that Plaintiffs' interest in reporting misconduct of a director within the HACC is "admittedly a recognized interest for public employees[.]" (Defs.' Br. 19.) They argue, however, that this interest is outweighed by the HACC's concern for ongoing investigations. (*Id.*)

The *Pickering* balancing test requires a court to balance the government's interest in performing its duties efficiently against an employee's interest in making that speech. As the Third Circuit has stated, "[o]n the employee's side of the scale, we must consider the interests of both [the plaintiff] and the public in the speech at issue." *Dougherty*, 772 F.3d at 991. "It is well established that '[s]peech involving government impropriety occupies the highest rung of First Amendment protection.'" *Id.* (quoting *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1274 (3d Cir.1994)). "Weighed on the other side is the government's legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" *Id.* (internal citation omitted). "While the test for disruption varies depending upon the nature of the speech, the factors a court typically considers include whether the speech 'impairs discipline by

superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quotation omitted).

There can be no dispute that the public interest weighs heavily in favor of Plaintiffs' speech. *See Baldassare v. New Jersey,* 250 F.3d 188, 198 (3d Cir. 2001) ("On the employee's side of this balance, the public's interest in exposing potential wrongdoing by public employees is especially powerful."). Plaintiffs reported that Isler permitted a resident to live rent-free in public housing (Brummell), an ineligible tenant to live in public housing in violation of applicable federal regulations (Coleman), an employee to continue working at the HACC despite allegations of sexual harassment (Ortiz), and, in the case of Evangelista, a report that Isler directed that scrap metal be taken from public housing and sold for personal profit.

Defendants contend that they were already pursuing investigations into Isler at the time Plaintiffs made their reports of misconduct, that Evangelista's refusal to cooperate in the investigation hindered the investigation, and that the "sanctity of an internal investigation was [] jeopardized and impacted by the constant communication between Plaintiffs and Norman Lee." (Defs.' Br. 18-19.) However, Defendants' argument completely ignores the four topics of speech that permeated this case, *i.e.*, Plaintiffs' reporting to Figueroa of Isler's misconduct with respect to Brummell, Coleman, Ortiz and/or the theft of scrap metal. There is no argument or evidence that these affirmative reports of misconduct interfered with the efficient functioning of the HACC or that a restriction on Plaintiffs' speech was necessary for the HACC to operate efficiently and

effectively, and the Court fails to see how Plaintiffs' reports to Figueroa could have posed any threats to the HACC's interest in efficiency or effectiveness.[8]

Considering the manner, content, and context of Plaintiffs' speech and the importance of the First Amendment interest inherent in that speech, Plaintiffs' interest in speaking outweighs Defendants' interests in a *Pickering* analysis. Even if Defendants had shown some evidence of disruption within the HACC, it does not overcome the evidence showing Plaintiffs' strong interest in speaking on matters central to the First Amendment protected activity under the circumstances presented here. As the Third Circuit has "long recognized":

> The First Amendment balancing test [of *Pickering*] can hardly be *controlled* by a finding that disruption did [or could] occur. An employee who . . . exposes . . . corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes . . . officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office. . . . The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

*Baldassare,* 250 F.3d at 200 (quoting *O'Donnell v. Yanchulis,* 875 F.2d 1059, 1062 (3d Cir. 1989)). In short, Defendants have not shown a concern for potential disruption based on Plaintiffs' speech. Without such a showing, Defendants' interest in promoting efficiency does not outweigh Plaintiffs' constitutionally protected right to speak on a matter of public concern.

In sum, construing all of the evidence in Plaintiffs' favor, the Court concludes that the jury's finding that Plaintiffs' speech is protected under the First Amendment is well-supported by the evidence adduced at trial, and was neither speculative nor conjectural. As this is the only basis upon which Defendants seek judgment as a matter of law, their motion is denied.

---

[8] The Court recognizes Defendants' argument that Evangelista's refusal to cooperate in an investigation hampered the functioning of the HACC, but Plaintiffs' speech also included their affirmative reporting of the corruption of Isler. Defendants fail to proffer a legitimate governmental interest hampered by this latter category of speech.

### E. Motion for New Trial

Defendants did not preserve an objection to the jury charges or verdict sheet in the manner contemplated by Rule 51. Defendants participated in the preparation of the verdict sheet and did not raise any objection at trial, and the Court used the relevant jury charge proposed by Defendants in the final charges. Defendants cannot now be heard to complain that the jury made findings on issues that should not have been presented to it. Therefore, as a general matter, the issue is forfeited as set forth above. Moreover, because the verdict sheet did not include a question regarding whether Plaintiffs' speech was a substantial or motivating factor in the alleged retaliatory action, the issue is waived under Federal Rule of Civil Procedure 49. FED. R. CIV. P. 49(a)(3) ("party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury").

Despite Defendants' failure to raise an objection at trial, the Court pursuant to Rules 51 and 61 considers whether the alleged error would be plain error or a miscarriage of justice. The crux of Defendants' argument for a new trial is that the jury should not have been asked to determine Plaintiffs' job duties and that "[h]ad this question not been asked, . . . the verdict would have been different given the jury's state of mind when answering the remaining questions[.]" (Defs.' Br. 20.) This argument ignores the law of this Circuit set forth above, which provides that "[w]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law" in which "the scope and content of a plaintiff's job responsibilities is a question of fact" that should be determined by a trier of fact. *Flora*, 776 F.3d at 175. "'[M]ixed question[s] of law and fact,' [have] typically been resolved by juries." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 424 (2015) (internal citation omitted); *cf Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (where case presents issue of whether a worker is employee or independent

contractor under FLSA, which is a mixed question of fact and law, "the issue would go to trial, with the jury resolving it through either special interrogatories or by deciding the classification issue"). Consistent with Third Circuit precedent, the verdict sheet in this case asked the jury to determine whether the speech at issue was within the scope of each plaintiff's job duties. Accordingly, the Court finds that a new trial is not warranted on the basis that the jury's verdict was tainted because the verdict sheet asked the jury to determine the scope of Plaintiffs' job duties, when it was the jury's job to decide this issue.

Furthermore, to the extent it was error to include on the verdict sheet any questions regarding whether Plaintiffs' speech was protected by the First Amendment because this issue was already decided by virtue of the jury charges, any such error is harmless. In reaching a verdict in favor of Plaintiffs, the jury necessarily found that Plaintiffs' speech was protected under the First Amendment, including that the speech was a matter of public concern and that the speech was outside the scope of Plaintiffs' job duties. These findings are consistent with the jury charges and Defendants' position that the Court had already decided that the speech at issue was protected under the First Amendment. As such, the Court perceives of no miscarriage of justice that could have resulted from the verdict sheet. In addition, the Court finds no miscarriage of justice insofar as the verdict sheet failed to ask whether Plaintiffs' speech was a substantial or motivating factor in their termination, as such fact is deemed to have been established in light of the verdict in favor of Plaintiffs.[9] *See* FED. R. CIV. P. 49(a)(3) (if neither jury nor court makes factual finding on an

[9] The Court notes that the jury charges expressly informed the jury that it must find that Plaintiffs' protected activity was a motivating factor in Defendants' decision for Plaintiffs to recover on their First Amendment claim. (Jury Charges 17, Dkt. 189.) The jury charges further explained: "If Defendants prove by a preponderance of the evidence that they would have treated Evangelista and Fussell the same even if Evangelista and Fussell's protected activity had played no role in the employment decision, then your verdict must be for Defendants on this claim." (*Id.* at 18.) Thus, though the verdict sheet did not include a separate question on whether Plaintiffs' speech was a

issue of fact raised by the evidence, "it is considered to have made a finding consistent with its judgment on the special verdict").

As noted above, Defendants also argue that it was error to include in the verdict sheet questions about Evangelista's refusal to identify sources of information as protected speech when the instructions did not address this issue. (Defs.' Reply 6, Dkt. No. 219.) Evangelista's First Amendment claims fell within two categories: his affirmative complaints of misconduct by Isler relating to Brummell, Coleman, Ortiz and scrap metal; and his refusal to identify the sources that reported the misconduct to him in connection with the HACC investigation. For reasons already discussed, the jury found that Evangelista's affirmative reporting of Isler was protected under the First Amendment, which conduct alone is sufficient to support the jury verdict, regardless of whether Evangelista's failure to cooperate in an investigation also constituted protected speech. Consequently, the Court finds no basis to conclude that the lack of a jury instruction concerning Evangelista's refusal to identify sources constitutes a miscarriage of justice.

In so finding, the Court rejects Defendants' reliance on *Babcock v. Rezak*, No. 96-0394, 2000 WL 1335743, at *1 (W.D.N.Y. Sep. 13, 2000). *Babcock* was a First Amendment case in which the plaintiff alleged that he had been fired from his position with the State University of New York Agricultural & Technical College due to his speech. *Id.* A jury trial resulted in a verdict for the defendant. *Id.* The jury charges informed the jury, erroneously, that the plaintiff must demonstrate that his speech was "the" substantial or motivating factor in the adverse employment action rather than "a" substantial or motivating factor. *Id.* The verdict sheet asked the jury whether the plaintiff had proven that his speech was "a" substantial or motivating factor, which prompted

motivating factor in their termination, the jury was expressly informed that such a finding was a prerequisite to entering a verdict in favor of Plaintiffs. The jury charges were available in the jury room during jury deliberations. The Court finds no miscarriage of justice under the circumstances.

a question by the jury as to the appropriate standard. *Id.* at *1-2. The court informed the jury that the verdict sheet should have asked whether the plaintiff's speech was "the" motivating factor, at which time defense counsel objected on the ground that the verdict sheet was correct. *Id.* at *2. The court denied the defendant's request to reword the clarification to the verdict sheet, and when the sheet was returned the jury had crossed out the word "a" substantial motivating factor and replaced it with the word "the". *Id.* After the jury found in favor of the defendant, the plaintiff moved for a new trial on the basis that the jury charges included the wrong legal standard, "which the jury clearly relied on in reaching their verdict as indicated by their changing the question on the verdict sheet[.]" *Id.* The court noted that a new trial may be granted when the verdict is a "miscarriage of justice" and found that a new trial was warranted because the court gave a misleading instruction that cited an incorrect legal standard. *Id.* By contrast, here, as set forth above, any error in the verdict sheet or jury charges was harmless. Defendants merely contend that the Court gave the jury questions on an issue that was "already decided by the Court." (Defs.' Br. 9.) Defendants do not argue that the instructions were misleading or directed the jury to apply an erroneous legal standard. The jury reached a verdict that was consistent with the jury charges. Accordingly, the Court finds no basis to grant a new trial.

**F. Remittitur**

Evangelista sought damages for wages, salary and other benefits lost because of the termination of his employment, as well as emotional and mental harm during and after the events at issue, including humiliation and mental anguish up until the date of trial. (Jury Charges 22, Dkt. No. 189.) Fussell sought damages only for emotional and mental harm during and after the events at issue, including humiliation and mental anguish up until the trial. (*Id.*) The jury awarded Evangelista $750,000 for emotional distress damages, and Fussell was awarded $450,000.

Defendants claim that even assuming the damages awarded to Plaintiffs represented remuneration for compensable injuries, the cumulative award of $1.2 million for emotional distress damages represents an excessive verdict given the extent of injury established by the evidence. (Defs.' Br. 24.) Defendants describe the emotional distress claims in this case as "garden variety," warranting a reduction because Plaintiffs did not seek medical treatment or present expert testimony to support their claims. (*Id.* at 22, 24.) Defendants assert that the Court must reduce the compensatory damage award and grant a new trial if Plaintiffs choose not to accept the remitted amounts. (*Id.* at 26.) Plaintiffs argue that there was sufficient evidence at trial to support the compensatory damage award. (Opp'n Br. 37-38.)

"In § 1983 actions, damages for violations of constitutional rights 'may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" *Pryer v. C.O. 3 Slavic,* 251 F.3d 448, 454 (3d Cir. 2001) (quoting *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307 (1986)). Distress, including "mental suffering or emotional anguish," is "a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978). However, a plaintiff may not recover compensatory damages for emotional distress "without proof that such injury actually was caused." *Id.* at 264. "A jury has very broad discretion in measuring damages; nevertheless, a jury may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket. There must be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs,* 823 F.2d at 773.

Here, the evidence of Plaintiffs' emotional distress was limited to their own testimony, which itself was brief and not particularly strong. Plaintiffs' testimony in this regard was general

and conclusory, and they proffered no proof of permanent injury, did not testify to debilitating alterations in lifestyle, and provided no corroborating testimony or medical evidence. As discussed *infra*, both Plaintiffs testified that they continued to receive income through other sources, and there is no evidence that their emotional distress incapacitated them from activities of daily living. The quality and quantity of Plaintiffs' testimony regarding their emotional anguish fell short in comparison to the amount of the compensatory damage award.

Fussell testified that because she was put on leave at Thanksgiving and fired before Christmas, she had to return Christmas presents that she had already purchased for family and friends, which made her feel embarrassed. (Trial Tr. vol. 2, 254, Dkt. No. 203.) She also testified that prior to her termination, she worked part-time as a server at a restaurant and placed her extra income in savings. (*Id.*) After she was fired from the HACC, although she was able to pick up additional hours at the restaurant, she did not make enough money to match the income she received while employed by the HACC and had to deplete her savings, which she testified caused her strain. (*Id.*) Her mental distress was heightened because she lost her health insurance when she was fired from the HACC, and because she was unemployed during the COVID-19 pandemic, she felt "scared" and "paranoid." (*Id.* at 257.) Fussell stated that her hair began to fall out, she had anxiety, and she had "nightmares of ever even speaking up against anything." (*Id.*) Furthermore, Fussell testified that she used to go to her aunt's restaurant, Corrine's Place, to visit family, but after she was fired she refused to go to the restaurant because Defendant Blackshear is also a frequent customer at the restaurant. (*Id.*) Fussell stated that she was afraid of Blackshear. (*Id.*) Although Fussell had not told her family what happened with her employment, Blackshear told Fussell's family, which Fussell testified made her feel embarrassed. (*Id.*) Plaintiffs also note Fussell's testimony that she had aspirations of advancing to a director position within the HACC

but her career aspirations have now been derailed because she was reinstated to a position where her prospects of advancement are not the same as they were before she was fired. (Opp'n Br. 28.) Notwithstanding this testimony, the Court also notes Fussell's testimony that her employment was reinstated after eighteen months, at which time she received an award of back pay. (Trial Tr. vol. 2, 252-53, Dkt. No. 203.) Moreover, with respect to the stress arising from her lack of health insurance during the COVID-19 pandemic, the Court notes that Plaintiff's job was reinstated in June 2020, shortly after the pandemic began. (*Id.* at 251.) In addition, Fussell did not testify that she saw a doctor or mental health professional to address any emotional distress she experienced as a result of her termination.

Evangelista testified that when he worked for the HACC, he was paid $95,000 a year, but since his termination he now earns less. (Trial Tr. vol. 2, 316, 319, Dkt. No. 203.) He applied for a full-time position at Rutgers University, but he was not offered the job after Rutgers reached out to his last employer, the HACC. (*Id.* at 317.) Evangelista testified that he now works two part-time jobs that allow him to pay his bills, but he is no longer making enough income to put money into a 401k and he has "somewhat curtailed some" of his activities with family. (*Id.* at 319). He stated that his emotions are a "wreck" and he has only slept four to five hours per night for the last six years. (*Id.*) He further testified that he feels embarrassed that he was fired from his job, and he has been unable to get a new job because the HACC will not give him a recommendation. (*Id.* at 319-20.) Evangelista noted that his friends are aware of why he lost his job, and he still does a lot of volunteer work with his friends, helping with organizations such as the VFW and Special Olympics. (*Id.* at 320.) Evangelista also testified that he saw a psychologist three times, and while he would like to still seek mental health treatment, he stopped going to the psychologist because

visits were not covered by his insurance and he could not afford the $100 fee associated with each visit. (*Id.* at 321-22.)[10]

In considering whether the jury's award of emotional distress damages "shocks the conscience," the Court examines jury awards of emotional distress damages in other cases in an effort to discern whether the award here falls outside the acceptable broad range. In addressing comparative awards, Defendants cite *Valentin v. Crozer-Chester Medical Center*, 986 F. Supp. 292, 305 (E.D. Pa. 1997), a case in which the plaintiff alleged national origin discrimination and retaliation for filing an EEOC charge, wherein the court remitted non-economic compensatory damages from $209,000 to $52,250, one-fourth of the award, where the only evidence presented at trial was the plaintiff's testimony about her distress. The *Valentin* plaintiff testified that she was "depressed" and upset by her termination and that it was humiliating for her to explain the circumstances of her termination to future employers, but the court noted that she "functioned well enough to obtain a suitable position a few months after her termination." *Id.* Defendants also rely on *Glass v. Snellbaker*, No. 05–1971, 2008 WL 4371760, at *20-23 (D.N.J. Sept. 17, 2008), a case in which the jury found that the defendant retaliated against the plaintiff on account of his First Amendment protected activity, where the court remitted non-economic compensatory damages by 80% to $50,000 where there was no evidence of "lasting harm, physically or emotionally, and there was significant evidence that there was no harm to Plaintiff's reputation, although he certainly felt humiliated" due to retaliation for his first amendment activity. Further, Defendants note that remittitur was appropriate in *Veikos v. Trs. of Univ. of Pennsylvania*, No. 20-04408, 2023

[10] Notwithstanding this testimony, Evangelista further testified that he was receiving income from a pension from his prior career as a police officer, also received Social Security benefits, and continued to maintain health insurance benefits because such insurance was obtained through his career as a police officer and not through his employment with the HACC. (Trial Tr. vol. 2, 324, Dkt. No. 203; Trial Tr. vol. 3, 352, Dkt. No. 204.)

WL 4494153, at *6-7 (E.D. Pa. July 12, 2023), where the court remitted the compensatory damage award from $1,000,000 to $100,000 in a case in which the plaintiff was denied tenure based on gender discrimination and the only evidence of emotional distress damages was plaintiff's testimony that she was humiliated, lost motivation, "ruined" her career path, and impacted her relationship with her parents. The court found that the plaintiff's testimony justified an award of damages for emotional distress, but not in the amount awarded by the jury. *Id.* at *7. In *Hall v. Pennsylvania Dep't of Corr.*, No. 02-1255, 2006 WL 2772551, at *19-20 (M.D. Pa. Sept. 25, 2006), also cited by Defendants, the plaintiff alleged that she was denied a promotional transfer in retaliation for her previous complaints of sexual discrimination and also asserted a hostile work environment claim, for which the jury awarded $1,000,000 in compensatory damages, but the award was reduced to $300,000 "pursuant to statutory limitations." The court in *Hall* found the retaliation verdict improper and further remitted the damages on the hostile work environment claim to only $75,000 on the basis that neither the plaintiff nor any other witness testified to how the plaintiff's relationship with family members was impacted, there was no evidence that the defendant's conduct necessitated psychological counseling or otherwise required hospitalization or medical treatment, and the plaintiff did not take a leave of absence from work. *Id.* at *22. Defendants further cite *Zielinski v. SPS Techs. LLC*, No. 10-3106, 2011 WL 5902214, at *1 (E.D. Pa. Nov. 22, 2011), a case in which the plaintiff alleged national origin discrimination, retaliation for complaining about the discrimination, and a hostile work environment. The jury awarded $250,000 in emotional distress damages, which the court remitted to $100,000. *Id.* at *10. The plaintiff had testified that he felt humiliated and had difficulty sleeping, but he presented no other witnesses to testify to the emotional injuries sustained, he never sought any medical treatment for

those injuries, and he "functioned well enough to obtain employment approximately six months after his termination." *Id.*

In *Spence,* cited by Defendants, the plaintiff was transferred out of her position as a high school art teacher to a position at an elementary school in retaliation for the exercise of her First Amendment rights. *Spence*, 806 F.2d at 1199. The plaintiff was awarded $25,000 in compensatory damages, consisting of both increased costs to the plaintiff for travel and emotional distress damages. *Id.* The evidence of emotional distress consisted of the plaintiff's own testimony that she was depressed and humiliated by the transfer and that she had "lost her motive to be creative." *Id.* at 1201. There was no testimony that plaintiff's peers held her in any less esteem, that she suffered physically from her emotional distress or that she sought professional psychiatric counseling, or that she suffered emotional distress resulting from loss of income. *Id.* The Third Circuit affirmed a remittitur of all emotional distress damages in the case because "neither the circumstances nor the testimony established" by a "reasonable probability" that emotional distress damages were incurred as a result of the plaintiff's transfer to a new school. *Id.*

Defendants concede that courts have affirmed large emotional distress verdicts, but only upon the presentation of more substantial evidence than that presented here. (Defs.' Br. 25-26.) For example, Defendants note that in *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 137 (3d Cir. 2007), the Third Circuit affirmed the denial of a motion for remittitur where the jury awarded the plaintiff $200,000 in emotional distress damages. In *Ridley*, the plaintiff alleged retaliatory demotion and retaliatory constructive discharge after he complained about race discrimination. *Id.* at 132. During trial, the plaintiff and his wife testified that he was not the same, had lost sleep and weight, became socially withdrawn, and had diminished self-worth. *Id.* at 137. Although the plaintiff in *Ridley* produced only the testimony of non-medical witnesses, the Third

Circuit found that there was sufficient evidence to support the jury's award of $200,000 in emotional distress damages. *Id.* Defendants also point to *Gagliardo v. Connaught Lab'ys, Inc.*, 311 F.3d 565, 573 (3d Cir. 2002), wherein the Third Circuit affirmed the denial of a motion for remittitur of a $1.55 million award for pain and suffering in a case alleging employment discrimination under the Americans with Disabilities Act and the Pennsylvania Human Relations Act. The plaintiff produced evidence from her co-workers and family demonstrating the effects that the defendant's conduct had on the plaintiff, including the mental trauma she experienced in which she transformed "from a happy and confident person to one who was withdrawn and indecisive." *Id.* at 574.

Relying on *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 348 (3d Cir. 2001), Plaintiffs contend that the jury verdict in the instant case is appropriate under the circumstances. In *Evans*, the jury returned a verdict in favor of the plaintiff and awarded her $1.15 million in compensatory damages, finding that her employer discriminated against her on the basis of race. *Id.* at 348, 353. The trial court concluded that the compensatory damage award was excessive and granted remittitur to $375,000. *Id.* at 353. The plaintiff challenged the remittitur and asked the Third Circuit to reinstate the jury's verdict. *Id.* The Third Circuit reviewed the remitted award to determine whether it was rationally based and concluded that although the amount of the award was "well above most emotional distress awards," it was not "outside the bounds of reason." *Id.* at 354, 355-56. The evidence at trial included the plaintiff's testimony that as a result of the discrimination, her relationship with her children and husband had been impacted, she was affected "on almost every level of [her] existence[,]" she questioned her ability to do her job, she was "moody and irritable all of the time" and she sought professional help. *Id.* at 352 n.5. Plaintiffs contend that the amount of the verdict in *Evans*, adjusted to present day value, is equivalent to

$741,000, thereby supporting the reasonableness of the verdict here. (Opp'n Br. 35-36.) However, the minimal evidence of emotional distress adduced at trial here was not akin to the "emotional trauma" experienced by the plaintiff in *Evans*, 273 F.3d at 356, and therefore cannot support a comparable emotional distress damage award.

Plaintiffs also cite a state court case, *Cuevas v. Wentworth Grp.*, 144 A.3d 890, 908 (N.J. 2016), *holding modified by Orientale v. Jennings*, 218 A.3d 806 (N.J. 2019), in support of the jury verdict. *Cuevas* involved a claim under the New Jersey Law Against Discrimination, N.J. STAT. ANN. § 10:5-1, *et seq.*, which expressly provides that victims of discrimination "suffer personal hardships" among which are "physical and emotional stress," "severe emotional trauma," "anxiety," and "family and social disruption." N.J. STAT. ANN. § 10:5-3. The New Jersey Supreme Court in *Cuevas* stated that "[b]ecause of the special harm caused by willful discrimination in the workplace, compensatory damages for emotional distress, including humiliation and indignity . . ., are remedies that require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action." *Cuevas*, 144 A.3d at 908 (internal citations and quotations omitted). One plaintiff in *Cuevas* was awarded $800,000 in emotional distress damages based on testimony that he felt "chopped down day by day, month by month," "helpless," "despondent," and "exhausted" and was "beset by anxiety over his financial security and his professional reputation, particularly after the retaliatory firing." *Id.* Another plaintiff was awarded $600,000 based on testimony concerning how the defendant's "degrading conduct toward him affected his 'psyche' and ruined his 'self-confidence,' how humiliated he was to be fired several weeks before Christmas for complaining about discriminatory treatment, how anxious he became about whether he could support his family, and how he fell into a depression." *Id.* In affirming the denial of remittitur, the New Jersey Supreme Court specifically noted that the plaintiffs' "mental anguish

and humiliation [] were sustained over a long period, and were not fleeting or insubstantial." *Id.* Again, the Court finds Plaintiffs' reliance on *Cuevas* misplaced given that the evidence of emotional damages presented at trial in *Cuevas* was significantly greater than the minimal evidence adduced at trial here.

Although the Court observes that mental suffering is "essentially subjective," *Carey*, 435 U.S. at 264 n.20, and does not lightly supplant the finding of the jury regarding the severity of Plaintiffs' injuries, the Court concludes the damages award is grossly excessive and not supported by the quantity and quality of the evidence presented at trial. While expert medical or psychological testimony is not required to show mental or emotional harm, *Bolden v. SEPTA,* 21 F.3d 29, 34 (3d Cir.1994), "[t]here must be a rational relationship between the specific injury sustained and the amount awarded," *Gumbs,* 823 F.2d at 773. Based on the evidence presented at trial, the Court concludes that Plaintiffs suffered "garden variety" emotional distress. *See Tavarez v. Twp. of Egg Harbor,* No. 09-6119, 2012 WL 13186197, at *4 n.3 (D.N.J. Aug. 3, 2012) ("The term 'garden-variety' emotional distress can be best described as general emotional distress, i.e. humiliation, mental anguish, etc., which does not implicate distress that is severe in nature, does not place plaintiff's mental condition at issue or is not alleged as a separate and distinct claim for damages."). Fussell did not present sufficient evidence to demonstrate that she suffered sufficient psychological harm worthy of a $450,000 judgment, nor did Evangelista present sufficient evidence to demonstrate that he suffered emotional harm worthy of a $750,000 judgment, and the Court finds that the compensatory damage awards are so excessive as to shock the conscience in light of the evidence presented at trial.

In assessing whether an award for emotional distress damages is excessive, the Court may look to similar cases, but must also be "mindful that each verdict revolves around a unique set of

facts and circumstances." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). None of the cases cited by the parties provides much guidance as to the exact amount of damages that would be appropriate in a circumstance such as this. The cases cited by Defendants suggest that awards less than $100,000 are appropriate for "garden variety" emotional distress, while Plaintiffs' cases support higher verdicts upon a showing of more substantial emotional trauma. The Court is left to determine what is reasonable or justified under the circumstances. In light of the jury's strong preference in favor of Plaintiffs, as evidenced by the large compensatory damage verdict, the Court will reduce the award to the greatest amount it thinks a juror could reasonably believe was commensurate to the actual injury Plaintiffs suffered. As such, the Court finds it appropriate to reduce the compensatory damage award for emotional distress to $300,000 for Evangelista and $200,000 for Fussell, the maximum recovery that does not shock the judicial conscience. *See Evans*, 273 F.3d at 355 ("remittitur should be set at the 'maximum recovery that does not shock the judicial conscience'") (quoting *Gumbs*, 823 F.2d at 774). The Court believes these figures adequately respect the jury's verdict without compensating Plaintiffs in a manner that grossly exceeds the extent of the emotional distress suggested by the testimony and record at trial.

Having found remittitur appropriate, the Court must outline specifically, with reference to the evidence presented at trial, the reasons for the amount of remittitur. Given that the evidence of compensable harm is entirely non-economic[11] and is based solely on the jury's subjective impression of the harm Plaintiffs testified about at trial, it is difficult to set forth particular evidence justifying a reduction in damages in a manner that might be possible if Plaintiffs had suffered a

[11] As noted *supra*, Evangelista also sought compensatory damages for lost income, but the jury separately awarded him $510,891 for lost earnings. Defendants do not challenge this component of the damage award. The Court considers herein only the non-economic portion of the damage award.

pecuniary injury. The Court arrived at the reduction by considering Plaintiffs' limited testimony regarding their emotional suffering and the impact on their lives. In particular, both Plaintiffs reported feeling humiliated, but each was able to function well enough to continue to work – Fussell as a server in a restaurant and Evangelista in two part-time positions – and thus there is no evidence that anxiety and depression prevented them from working. Both Plaintiffs also reported worry and physical effects from their stress – Fussell experienced hair loss and nightmares, while Evangelista was only able to sleep four to five hours per night – but Fussell did not testify that she sought counseling or other mental health treatment, and Evangelista chose to forgo treatment after three sessions due to the cost despite receiving his pension and health benefits. Fussell's employment was reinstated with back pay after eighteen months, and Evangelista continued to receive supplemental income through his pension and Social Security, and as such there was limited evidence of significant stress due to financial hardship. No family member or friend testified about the emotional impact that Defendants' conduct had on Plaintiffs as corroborating testimony. Plaintiffs testified that they felt embarrassed, but there was no testimony that Plaintiffs' family or peers held them in less esteem. Plaintiffs described their stress in mostly general and conclusory terms and failed to provide sufficient testimony of suffering to support a substantial compensatory damage award.

In sum, a court should not lower a damage award if the evidence in the record supports it, but in this case remittitur is appropriate. The award of $750,000 for Evangelista's emotional distress and $450,000 for Fussell's emotional distress cannot be supported by this record. The amount is so disproportionate to the injuries described at trial as to shock the judicial conscience.

## CONCLUSION

For the reasons set forth above, Defendants are not entitled to judgment as a matter of law or a new trial. However, the jury verdict of $750,000 for Evangelista and $450,000 for Fussell for unlawful retaliation is grossly excessive in light of the relatively minimal evidence Plaintiffs produced at trial and the "garden variety" nature of the claimed emotional harm. Remittitur is therefore required to vindicate the interests of justice. The damages award in Plaintiffs' favor will be remitted to $300,000 for Evangelista and $200,000 for Fussell. If Plaintiffs do not accept this remittitur within thirty days, there shall be a new trial on damages for emotional distress.

An appropriate Order follows.

Dated: September 24, 2026

KAREN M. WILLIAMS
United States District Judge